Filed 3/26/19; Modified and Certified for Publication 4/22/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| N.T.,<br><br>    Appellant,<br><br>      v.<br><br>H.T.,<br><br>    Respondent. | G055885<br><br>(Super. Ct. No. 17D007933)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Donald F. Gaffney, Judge.  Reversed and remanded with directions.

Family Violence Appellate Project, Jennafer Dorfman Wagner, Shorah Ghorishi; UCI Domestic Violence Clinic, Patricia Cyr, Jane Stover; Jones Day and Craig E. Stewart for Appellant.

No appearance for Respondent.

\*        \*        \*

A wife sought a domestic violence restraining order (DVRO) against her husband for acts specifically violating the temporary restraining order (TRO) the trial court had issued against the husband eight months earlier.  The court denied the DVRO on the ground that a technical violation of a TRO was not an act of domestic violence.  We reverse and remand.

For purposes of the Domestic Violence Prevention Act, Family Code section 6200 et seq. (DVPA), abuse includes behaviors that were enjoined by a TRO, and is not limited to acts inflicting physical injury.  (Fam. Code, § 6203.)  (All further statutory references are to the Family Code, unless otherwise noted.)  On remand, the trial court shall make necessary findings regarding whether the acts alleged by the wife actually occurred and, if they did, the court shall enter the DVRO as requested.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

I.

*THE TEMPORARY RESTRAINING ORDER*

In January 2017, N. sought a TRO protecting her, her three-year-old son I.,[1] and her seven-month-old daughter C. from her husband H.  The trial court granted the TRO and ordered H. not to:  "Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, impersonate (on the Internet, electronically or otherwise), or block movements [of N.]; [¶] Contact [N.], either directly or indirectly, in any way, including but not limited to, by telephone, mail, e-mail or other electronic means; [¶] [or] Take any action, directly or through others, to obtain the addresses or locations of [N.]"  The order provided:  "Brief and peaceful contact with [N.], and peaceful contact with children . . . , as required for court-ordered visitation of children, is allowed."

---

[1]  I. is N.'s son from a previous relationship; C. is N. and H.'s child.

In May 2017, the parties agreed to extend the TRO to September 2017. At that time, the TRO was modified to provide that exchanges of C. for visitation were to take place inside the Mission Viejo police station.

## II.

### *THE REQUEST FOR A DOMESTIC VIOLENCE RESTRAINING ORDER*

In September 2017, N. filed a request for a DVRO, which was based entirely on H.'s alleged violations of the TRO. H. denied any violation of the TRO.

The parties' written submissions and testimony regarding the alleged TRO violations are summarized here:

> 1. *Refusing to give C. to N. during exchanges,*
> *unless N. would interact with H.*

On multiple occasions at child exchanges where their interaction was to be limited to communications regarding C., H. urged N. to reconcile with him. In her declaration in support of the DVRO request, N. stated: "As the end date of the Order is approaching, H[.] is more aggressive with his constant harassment. He tells me that I should kiss him and hold his hand and that I have responsibilities as his wife. He also tells me that I have demons in me. I cannot walk away because, while he is talking to me, he is either holding our daughter or getting her things one by one from the car. [¶] . . . One example of this behavior took place on or around July 17, 2017. H[.] was withholding our girl and I said 'please do me a favor and give me the girl.' He said, 'no talk to me' and I said 'whenever I cared for you, you did not care, I don't want to talk to you anymore, there is nothing to talk about.' He continued to keep C[.] from me and asked me to stay and talk to him. He was withholding her [from] me more than ten minutes while I told him I did not want to talk to him."

At the hearing, N. testified: "[H]e took advantage of the situations and saying he needed to talk to me and that I had obligations towards him as a wife. He gave me presents also to get back together. I told him we have a restraining order, and he

3

didn't abide by it." N. offered into evidence written transcripts of audiotapes of two visitation exchanges at which H. told N. he did not need to abide by the terms of the restraining order; engaged N. in discussing their relationship and pending divorce; asked her for a hug; implied that if N. did not cooperate with him, H. would fight for custody of C.; asked N. why she was not wearing her wedding ring and whether she missed him; suggested they go to joint counseling; and referred to N. as "my love" and asked her to kiss him.[2]

On another occasion, N.'s friend Yasmin, who had driven N. to the visitation exchange, videotaped the incident. H. stalled in returning C. to N. so he could talk to her, and reminded N. that she was his wife. N. said to H., "Just give me the baby. We're not supposed to be having a conversation." H. replied, "You are still my wife, and I have the right to be here with you and the baby. I just need to talk to you." N. repeatedly asked H. to give C. to her, at one point exclaiming, "Give me the girl! Please!? In what way do I have to tell you!?"

H.'s declaration in opposition to the DVRO stated, in relevant part: "During the times of the child exchange, I limit my communication with Petitioner to comments and/or questions related to our daughter's health and wellbeing. On occasion I will tell Petitioner 'good afternoon' or 'good morning' and there has been a time where I have said quietly 'I ask God to pray for our family.' I do not deny that I am a man of strong Christian faith." H. also stated: "Petitioner's claims that I demand to hold her hand or to kiss her are more false allegations. When I pick up and return our daughter, I do so in an organized and efficient manner. I do not unnecessarily prolong the pick up or return as Petitioner claims." H. testified that the delays at the exchanges, including

---

[2] H.'s trial counsel agreed the audio recordings substantially reflected the recorded conversations, and the transcripts of the audio recordings were admitted without objection.

those evidenced by the audiotapes, were caused by waiting for a police officer to come out of the station to observe the exchange.

2. *Following N. after a visitation exchange.*

N. testified that after one visitation exchange H. followed her, asking "why don't you stay and talk to me?" H. also asked N. who was waiting for her. N. left in a different direction.

In his declaration, H. stated that N. accused him of following her from Santa Ana to Mission Viejo (where they both lived) after visitation, but that he had not been charged with a violation of the TRO because there was no proof.

3. *Entering N.'s apartment complex.*

The TRO provided that N.'s address was confidential and prohibited H. from obtaining her address. N. did not provide her address to H., but nevertheless saw him "around my house." Yasmin testified she saw H. in his car at N.'s apartment complex. At the hearing, a time-stamped photograph taken by Yasmin of H.'s car leaving N.'s neighborhood was admitted. In her declaration, N. stated: "I no longer feel safe in the home I worked hard to get for my family."

4. *Taking C. from N. before the scheduled visitation exchange time and from a location other than the agreed-upon location.*

The TRO, as modified by the parties' agreement, provided that H.'s weekday visitation time with C. was to begin at 2:00 p.m., and the exchange was to take place inside the Mission Viejo police station. On August 23, N. agreed to change the start time of the visit to 3:00 p.m. to accommodate H.'s work schedule. N. was with C. at the Mission Viejo library, which is next to the police station, when H. showed up at 2:45 p.m. and immediately took C. over N.'s objection. H. testified that he had come early to see if other children were at the library and had not expected to see C. there. He asserted that he only picked up C. because she smiled at him when she saw him. H. did not deny that the result was that he had taken C. from the wrong place at the wrong time.

5

5. *Handing N. a letter.*

At one of the child exchanges, H. gave N. a letter. H. admitted writing the letter, despite the TRO's specific orders that he limit communication with N. to brief, peaceful communication concerning visitation. H. testified he placed the letter in C.'s diaper bag to "uplift hope for the—just hoping, just praying."

The letter quoted or paraphrased several verses from the Bible regarding overcoming sin and demons, intermixed with H.'s comments regarding N.'s "dirtiness" resulting from her childhood experiences:

"God's Promise:

"I will remove you from a nation and bring you to a new land. And then 'I will spray you with clean water' [clean water = God's word in the Bible] and you will heal. Since you were born, your experiences have caused dirtiness and curses on your soul, spirit, and thought and all the idols, statues, human beings and concepts that followed you, etc. I will cleanse you of that filth (Ef[e]c[i]os 5:26–28). I will also place a new spirit inside you; and will remove the heart of stone within your body and will give you a new heart made of flesh. I shall place 'my Spirit' inside you and cause you to walk in my statutes of my laws and you will be careful in observing my ordinances (E[z]ekiel 36:24–37)

"Even though your sins and curses are as red as the scarlet, your spirit will be cleaned and will be as white as the snow (Isaias 1:18)

"God removes curses, demons, forgotten sins of his children no matter if they are as 'deep as the ocean' (Micah 7:19) and forgives their wickedness and the mistakes they have committed. Sinner and forgets them (Jeremias 31:34)" (First brackets in original.)

H. also admitted giving N. a rose on her birthday.

## III.

*THE TRIAL COURT'S RULING*

In denying N.'s request for a DVRO, the trial court provided the following analysis: "Everything else, it appears, is only domestic violence if I draw the conclusion that violating a TRO is in and of itself domestic violence. I cannot draw that conclusion. And the incidents which have been referred to simply don't amount to domestic violence. [¶] . . . [¶]

"All that was brought up to the court's attention are what are, yes, technical violations of the TRO. He picked the child up early. He talked about something at the exchange other than the child.

"Are these technical violations of the TRO? Yes, they are. But just because they are technical violations of the TRO doesn't mean they are domestic violence. I am not aware of the authority that says a violation of a TRO is in and of itself domestic violence. It is the requesting party's burden to prove by a preponderance of the evidence that domestic violence has occurred in the relationship. That burden has not been met here. The court declines to issue a permanent domestic violence restraining order." N. timely filed a notice of appeal from the trial court's order.

## DISCUSSION

The denial of a restraining order under the DVPA is appealable. (Code Civ. Proc., § 904.1, subd. (a)(6); *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 332.) "We review an appeal from an order denying a request to renew a domestic violence restraining order for abuse of discretion. [Citations] . . . [T]he question of 'whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review.'" (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 560.)

7

Section 6203 defines "'abuse'" under the DVPA as "any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) *To engage in any behavior that has been or could be enjoined pursuant to Section 6320. [¶] (b) Abuse is not limited to the actual infliction of physical injury or assault*." (§ 6203, italics added.)

The DVPA's "protective purpose is broad both in its stated intent and its breadth of persons protected." (*Caldwell v. Coppola* (1990) 219 Cal.App.3d 859, 863.) The DVPA must be broadly construed in order to accomplish the statute's purpose. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498.)

N. raises two legal arguments on appeal: (1) the trial court erred in ruling that a violation of the TRO was not itself an act of abuse; and (2) the trial court erred in ruling the alleged conduct, if proven at the hearing, would not independently constitute abuse. We agree as to both arguments.

Section 6203, subdivision (a)(4) specifically provides that engaging in behavior that has been enjoined pursuant to section 6320 constitutes abuse for purposes of the DVPA. Section 6320 allows a court to enjoin, among other things, stalking, threatening, harassing, contacting directly or indirectly, or disturbing the peace of the protected party. (*Id.*, subd. (a).)

In this case, the TRO ordered H. not to harass N.; stalk N.; disturb N.'s peace; contact N. directly or indirectly, in any way, other than engaging in "peaceful contact" required for visitation with C.; or obtain N.'s address. N. offered admissible evidence that H. had violated each of these prohibitions. For his part, H. did not deny he had engaged in many of the actions of which N. complained, but minimized them or attempted to justify them by explaining his desire to reunify with N. and spend more time with C.

8

"[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni, supra,* 173 Cal.App.4th at p. 1497; see *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 821-822 [trial court erred in ruling that evidence of mental abuse and controlling behavior was not relevant to DVRO analysis]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1145-1147 [*Nadkarni*'s interpretation of "'disturbing the peace of the other party'" under the DVPA "is well reasoned"].) H.'s alleged acts of (1) communicating with N. about issues in excess of those necessary to C.'s custody exchanges; (2) obtaining N.'s address and stalking her; and (3) disturbing N.'s peace by continuing to seek reconciliation, verbally attacking her, and threatening her regarding visitation and custody would constitute violations of the TRO, and would justify issuance of the DVRO as requested.

H.'s alleged violations of the TRO would not be technical violations, as suggested by the trial court. H.'s alleged attempted verbal communications with N. were lengthy and were not limited to communications regarding C.'s visitation. To the contrary, if N. is believed, H. attempted to engage N. in discussions regarding their relationship and requested intimate physical contact. H. also wrote a letter to N. and placed it in C.'s diaper bag. H. drove to N.'s apartment complex, where he was photographed by Yasmin. A knowing violation of a DVRO cannot be characterized "'as a de minimis and technical violation.'" (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 334-335.)

In any event, H.'s alleged actions, as described *ante*, would have been acts of abuse without the existence of the TRO. H.'s alleged actions would be obvious breaches of N.'s peace, and therefore would have justified the issuance of a DVRO on their own.

We have concluded that the trial court used an incorrect legal standard in denying the DVRO. Because the court found that H.'s violations were technical, and

further found that TRO violations did not constitute acts of abuse for purposes of the DVPA, it failed to make the necessary factual findings regarding the issuance of the DVRO.  If all material evidence were undisputed, we would be able to determine this as a matter of law, and would order the trial court to enter the DVRO as requested.  H.'s written opposition and testimony at the hearing in the trial court make this remedy impossible because we do not weigh evidence.  We will therefore reverse the order denying the DVRO and remand the matter to the trial court to make the necessary findings and determine whether to issue the DVRO.  If the court finds that the acts alleged by N. did, in fact, occur, then the court shall issue the DVRO.

DISPOSITION

The order is reversed and the matter is remanded to the trial court. Appellant to recover costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

10

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| N.T., | |
|   Appellant, | G055885 |
|     v. | (Super. Ct. No. 17D007933) |
| H.T., | ORDER MODIFIYING OPINION AND GRANTING REQUEST FOR PUBLICATION; NO CHANGE JUDGMENT |
|   Respondent. | |

It is ordered that the opinion filed March 26, 2019, be modified as follows:

On page 1, first sentence of the second full paragraph, the name "Shorah" is changed to "Shuray" so the sentence reads:

Family Violence Appellate Project, Jennafer Dorfman Wagner, Shuray Ghorishi; UCI Domestic Violence Clinic, Patricia Cyr, Jane Stover; Jones Day and Craig E. Stewart for Appellant.

Counsel for Appellant Family Violence Appellate Project and the Domestic Violence Clinic at the University of California, Irvine, joined by AIDS Legal Referral Panel, Bay Area Legal Aid, Bet Tzedek Legal Services, California Protective Parents Association, California Women's Law Center, Child Abuse Forensic Institute, Domestic Abuse Center, Domestic Violence Legal Empowerment and Appeals Project, Doves of Big Bear Valley, Inc., Harriett Buhai Center for Family Law, Lassen Family Services,

Law Foundation of Silicon Valley, Law Office of Melinda Gomez, Los Angeles Center for Law & Justice, Maitri, National Housing Law Project, Riverside County Coalition for Alternatives to Domestic Violence, San Diego Volunteer Lawyer Program, Inc., Sojourn, Professor Margaret Drew, and Professor Julie Saffren, have requested that our opinion, filed on March 26, 2019, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rules 8.1105(c)(2), (3), (4), and (6). The requests are GRANTED. The opinion is ordered published in the Official Reports. This modification does not change the judgment.


                                        FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.