Filed 9/30/21; Certified for publication 10/26/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| K.L.,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>R.H.,<br><br>    Defendant and Appellant. | G059109<br><br>(Super. Ct. No. 18P001978)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Andre De La Cruz, Judge. Affirmed in part and reversed in part.

Sheppard Mullin Richter & Hampton, Anna S. McLean, Kathryn Kafka, Michael Lundholm; UCI School of Law Domestic Violence Clinic, Jane K. Stoever; Family Violence Appellate Project, Arati Vasan, Jennafer Dorfman Wagner, Erin Smith; Community Legal Aid SoCal, Sarah Reisman, Erica Embree, Janista Lee, Valerie Vasquez and Michelle Kotval for Appellant.

California Women's Law Center, Amy C. Poyer; Troutman Pepper Hamilton Sanders, Pamela S. Palmer, Cindy J. Lee, Elizabeth Holt Andrews and Lauren E. Grochow for California Women's Law Center as Amicus Curiae on behalf of Appellant.

Thuerwachter Law Group and James Thuerwachter for LLS Anti-Racism Center, Aoki Center for Critical Race and Nation Studies, Center on Race, Inequality and the Law, Charles Hamilton Houston Institute for Race and Justice, Fordham Law School's Center on Race, Law, and Justice, Fred T. Korematsu Center for Law and Equality, and Nathaniel R. Jones Center for Race, Gender, and Social Justice as Amici Curiae on behalf of Appellant.

K. L., in pro. per., for Respondent.

\*  \*  \*

INTRODUCTION

The purpose of the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6300 et seq.) "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (*Id.*, § 6220.) To achieve this purpose, the DVPA authorizes the court to issue orders enjoining a party from, among other things, "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, . . . destroying personal property, . . . coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (*Id.*, § 6320, subd. (a).)

The DVPA prohibits mutual orders enjoining both parties from the foregoing behavior unless "[t]he court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in

2

self-defense." (Fam. Code, § 6305, subd. (a)(2).) In determining whether a party was a primary aggressor or acted in self-defense, the trial court must consider the factors set forth in Penal Code section 836, subdivision (c)(3).

K.L. and R.H. are the parents of Z.L.; their year-long relationship was defined by multiple acts of abuse by K.L., and the complete inability of either party to effectively communicate with the other. After their domestic relationship ended, both filed requests for DVPA orders against the other in December 2019. In February 2020, after an evidentiary hearing, the trial court found that both K.L. and R.H. had acted as a primary aggressor against the other, and that neither had acted in self-defense. The court therefore issued mutual orders against both parties, and also issued orders granting joint physical and legal custody of Z.L. to both parties.

The trial court erred by issuing mutual restraining orders without considering and following the relevant statutory authority. Because there was more than sufficient evidence supporting a DVPA order protecting R.H. and her child H.H. from K.L., that order shall be affirmed. We reverse the orders regarding child custody. If, after the trial court regains jurisdiction following the resolution of the dependency proceedings involving Z.L., either party files a request for order concerning custody, the trial court shall consider and apply the rebuttable presumption of Family Code section 3044 and the factors that may overcome that presumption.

STATEMENT OF FACTS

R.H. and K.L. began dating in the fall of 2017, and ended their relationship in December 2018. R.H. had a child before meeting K.L.; H.H. is now about seven years old. R.H. and K.L.'s child, Z.L., was born in November 2018.

Soon after they started dating, on November 23, 2017, K.L. appeared on R.H.'s doorstep after an argument and pointed a gun at her chest and then at her forehead. R.H. was terrified. K.L. ordered R.H. to calm down and be quiet and hit her in the face,

3

but she could not stop crying. When K.L. allowed R.H. to go to her bedroom, she was shaking so badly she could not stand. K.L. laughed at R.H. and held out the gun to show her there were no bullets in it.

R.H. locked herself in her bedroom that night, and did not answer when K.L. knocked on the door in the middle of the night. The next morning, when R.H. would not let him in, K.L. broke down the locked door. When R.H. asked him to leave, K.L. punched her in the face several times. He grabbed her and slammed her head into the nightstand about six times. K.L. also tore out R.H.'s braids, which were sewn into her scalp. He also tried to rip off her tube top and take pictures of her naked body.

A neighbor heard R.H. screaming and called 911. The police came and K.L. admitted to "forcibly" pulling off her wig with the intention of taking pictures of her and posting them on social media. K.L. was detained on a charge of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)), but R.H. chose not to press charges because K.L. apologized and they were still in a relationship.

On April 29, 2018, K.L. became upset with R.H. because she had not made dinner for him. K.L. claimed R.H. was using her pregnancy as an excuse for being lazy. K.L. became angry when the microwave he was trying to use did not work, and he threw it across the living room toward where R.H. and then four-year-old H.H. were sitting. When the microwave landed near H.H.'s feet, the child screamed, ran into the bedroom, and locked the door. R.H. was afraid that K.L. was going to attack her.

On October 26, 2018, R.H., who was then eight months pregnant, woke up hungry in the middle of the night and went to get food. K.L. yelled at her to return to bed, and she was so upset she could not stop crying. K.L. pushed R.H. off the bed, and she landed on her abdomen. R.H. immediately felt a sharp pain, and began bleeding the next morning. At the hospital, she was diagnosed with an antepartum hemorrhage and given an injection to prevent contractions.

4

While R.H. was pregnant, K.L. would threaten suicide when they were communicating via FaceTime. R.H. believed K.L. was manipulating her.

On November 28, 2018, K.L. went to the home of R.H.'s mother, J.A., looking for R.H. K.L. became upset, refused to leave, and cursed at J.A., who threatened to call the police. K.L. responded, "You and your family, you think I'm scared of the police. The police carry gun and I carry gun. I'm not afraid of the police. You can call the police all you want." When they struggled at the front door, K.L. hit J.A. in the nose with his elbow, causing it to bleed.

On December 18, 2018, K.L., while holding newborn Z.L. in one arm, placed R.H. in a chokehold with the other, saying, "You are going to respect me as Z[.'s] dad." R.H. stopped struggling in order to breathe as her vision started to fade. K.L. threatened, "From today on, this is what's going to happen to you if you don't listen to what I'm saying." Later that same evening, K.L. came to R.H.'s apartment and pushed her into the bedroom. He pushed her onto the bed and then dragged her off the bed by her leg. R.H. felt a sharp pain in her back when she landed on the floor. During that incident, K.L. shut H.H.'s fingers in the door, leaving a scar in the nailbed. He said, "What are you going to do about it?" when R.H. told him to apologize to H.H.

K.L. described the December 18, 2018 incident in his request for a DVPA order: "I got home from taking our son out. R[.H.] was upset at me for that then she hits me while I was standing in the closet with a plastic tool box breaking it. I received a[] bruise on my right forearm blocking the attack. I had my son in the other arm defending her off until her sister's husband came to break [it] up."

On December 27, 2018, R.H. called the police after K.L. failed to return by midnight with newborn Z.L. When K.L. finally returned at 12:30 a.m. and learned that R.H. had called the police, he grabbed her and pinned her against the wall with his right forearm across her neck while he was holding Z.L. in his left arm.

5

In February 2019, K.L. threw R.H.'s phone out of the car window and punched R.H. in the neck.

On March 12, 2019, R.H. was staying in a hotel while she was transitioning from a domestic violence shelter. She had consumed two drinks and taken Benadryl to help her sleep. K.L. came over to apologize for an earlier incident, but became upset when he saw the empty alcohol bottles. He left, but called to apologize and came back again with brownies. R.H. could not remember anything else from that night after K.L. arrived the second time. She woke up the next morning on the floor without underwear, feeling pain in the back of her neck. Her sewn-in hair braids had been pulled out of her head, and she discovered dried semen on her buttocks. K.L. was sleeping on the bed; she asked him what had happened, he shrugged and went back to sleep.

During a text message exchange later that day regarding visitation, K.L. sent R.H. a photo showing her face-down on the floor, unconscious, with semen on her buttocks. In another text message, K.L. said he sent the picture to show her how "disgusting" she is, and included a middle finger emoji. R.H. called K.L. and he admitted he penetrated her. She asked him why he took the photo and he said it did not matter but he wanted to see Z.L. R.H. did not consent to having sexual intercourse with K.L. on March 12.

On May 15, 2019, K.L. physically picked up R.H. and forced her into his car. When R.H. tried to scream, K.L. covered her mouth. He then blocked her from getting out of the car.

On June 27, 2019, R.H. and K.L. argued at a custody exchange. When R.H. got in the driver's seat of her car, K.L., who was holding Z.L., prevented her from closing the car door. K.L. reached into the car and began choking R.H.. R.H. was able to push K.L. away and close the car door. Later that day, K.L. reported R.H. to the police, claiming that she had pushed him. She was arrested but not charged.

6

In his earlier request for a DVPA order, K.L. described the incident in June 2019: "As I was holding our son, and trying to put him in the car, R[.H.] came around the car and started to push me on my arm and my chest. As I tried to put Z[.L.] down she grabs my shirt and starts to jerk me around and pulls me into the car and starts to slap and punch me in my face and chest. Our son starts to cry because he is still in my arms. . . . As R[.H.] slaps me one last time, I stumble and fall to the ground and scrap[e] my knee. I [managed] to put my son safely on the seat but he was still crying. I jumped [and] ran to my car an[d] I notice the scratches on my left arm and I called the police."

On August 22, 2019, K.L. told R.H., "I don't care who you end up with, your pussy will always be mine."

Between September and November 2019, R.H. saw a gun in K.L.'s apartment on several occasions.[1] K.L. choked R.H. multiple times, and harmed her in the presence of H.H. and Z.L. multiple times.

On October 6, 2019, as R.H. was getting Z.L. out of his car seat, K.L. grabbed her buttocks and said, "You know I can't help it when I see your ass."

On October 20, 2019, during a period of reconciliation, K.L. woke R.H. while she was sleeping in his apartment and pulled her off the bed, causing her head to hit the floor. Z.L., who was sleeping on the bed next to R.H., began to cry. K.L. pushed R.H. out of the apartment; H.H. came with her. R.H. texted K.L. to open the gate so she could get her car out. K.L. came out holding Z.L. and banged on the driver's side window so forcefully that R.H. feared the glass would break. H.H. was crying and holding on to R.H. Z.L.'s head was jerked back and forth as K.L. struck the window while holding Z.L. When R.H. opened the door slightly to try to stop him, K.L. yanked the door open and began strangling R.H. with one hand while holding their child with the other, causing Z.L. and R.H. to knock heads. R.H. struggled to breathe, could feel K.L.'s

---

[1] The trial court rejected K.L.'s testimony that he did not own a gun: "I don't find you credible, sir, with respect to the gun."

fingernails tearing into her skin, thought she was losing consciousness, felt like her eye was going to pop out, and felt a lot of pressure in her head as her vision started to fade. When K.L. grabbed R.H.'s neck with both hands, Z.L. began slipping through his arms; K.L. was holding Z.L.'s head between his arm and elbow. R.H. believed she was going to die.

R.H. tried to call 911, but K.L. grabbed her phone, smashed it into the pavement and destroyed it. K.L. bashed R.H.'s head into the metal between the front and rear driver's side car windows. H.H. was screaming in the backseat. After R.H. was finally able to drive away, she stopped a police car and the police made a report, noting an abrasion on her neck. Although the report describes K.L., it mistakenly lists another person's name as R.H.'s attacker.

K.L. denied being with R.H. on October 20, and claimed R.H. had given the police the wrong name and address of her attacker to get him arrested.

In late 2019, R.H. sought help, staying with the two children at a confidential domestic violence shelter. On November 26, 2019, K.L. went to R.H.'s shelter and parked his car outside. As the shelter director testified, shelter staff instructed K.L. he could not be there and made an emergency transfer of R.H. and her children to a motel. The next morning, K.L. returned looking for R.H. The shelter director called the police.

On December 2, 2019, R.H. arrived at the Garden Grove Police Station to pick up Z.L. from K.L. She noticed that K.L. had shaved Z.L.'s head against his doctor's recommendation (Z.L.'s fontanels had not yet closed). R.H. asked K.L. why he had done it, and he told her "that's what [she got] for making him miss [Z.L.'s] birthday."

R.H. turned Z.L around and noticed a bruise behind his ear. She became upset, telling K.L. that she was not bringing Z.L. back until she saw a judge and that she was filing for a restraining order. K.L. responded that his mom was going to "whoop

8

[her] ass." R.H. testified that she said, "Fuck you and your mom." K.L. claimed R.H. said she was going to "fuck [him] up" and kill him.

R.H. returned to the domestic violence shelter where she was living and told the program manager what happened. The manager called K.L. around 8:00 p.m., notifying him that R.H. would be seeking a restraining order the next day.

On December 21, 2019, after the court had granted temporary restraining orders to both parties, K.L. punched R.H. in the head at a visitation exchange in front of the Westminster Police Station. R.H. felt a sharp pain and was frightened. K.L. claimed he had a video showing the incident did not occur, but did not introduce the video at the hearing.

K.L. and R.H. used the Talking Parents app to communicate regarding Z.L. Talking Parents is a court-mandated, online coparenting communication tool that records the time messages are sent and read, prevents messages from being altered or deleted, and is admissible in court. (See *Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 364; see also <https://talkingparents.com>.) As part of K.L.'s request for a DVPA order, the following communications from R.H. on Talking Parents were read into the record: July 29, 2019: "Also, being sick doesn't mean I can't take care of my kids, you dick." September 9, 2019: "You like being a dick."[2] The court also read into the record several exchanges between K.L. and R.H. involving R.H.'s failure to show up on time for custody exchanges.

---

[2] The court also read the following into the record: "No, you didn't prove my point but you're a cunt." "You're not his father because you don't act like one." "CPS case, tell your bitch ass called them on me." "Because ain't got time for your bitch ass." All of these communications occurred before the hearing on K.L.'s first request for a DVPA order, and the court ruled that all evidence predating K.L.'s first restraining order hearing in July 2019 was inadmissible in connection with K.L.'s current request for a DVPA order under res judicata principles.

R.H. also had read into the record messages from K.L. to her on Talking Parents: "I guess Z[.L.] being raised by African bitches and all you guys from [*sic*] and your grandmother you still need public assistance for the rest of your life or take care of a man. You claim I beat you up. Wait until you marry a white man and beat your ass all the time and no one will believe you. I know your dad turning in his grave seeing his daughter suck dick for a living, but you'll probably lie how you got there, too, about your dad. Go bleach your skin like your mom, you ugly bitch. Once you go get your boobs done, they look saggy, old Sponge Bob body ass. You look stupid living in the house. One day you won't be able to afford to live nowhere and you'll have to bounce from program to program."[3]

The court also considered evidence that R.H. had pleaded guilty to misdemeanor child endangerment (Pen. Code, § 273a) and misdemeanor commercial burglary (*id.*, §§ 459, 460, subd. (b)) in 2014,[4] and had suffered several probation violations before being dismissed early from probation in January 2020. R.H. was also convicted of providing false identification to a peace officer, and detained but not arrested or charged with child cruelty and battery on a spouse in June 2019.

---

[3] While being questioned by R.H.'s counsel, K.L. read this message into the record; the trial court erroneously excluded it and another message R.H. tried to introduce. As noted *ante*, the court ruled that evidence of R.H.'s abuse of K.L. predating K.L.'s first restraining order hearing in July 2019 was inadmissible in connection with K.L.'s current request for a DVPA order under res judicata principles. However, res judicata did not apply to the messages offered by R.H. because she had not previously filed a restraining order request. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 446; *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 556.)

[4] The factual basis for R.H.'s guilty plea reads as follows: "In Orange County, on Aug. 16, 2014, I did willfully and unlawfully enter Kohl's a commercial building with the intent to commit theft. I also unlawfully endangered my child under circumstances and conditions likely to produce great bodily harm and death."

PROCEDURAL HISTORY

On June 28, 2019, K.L. filed a request for a DVPA order, seeking protection for himself and Z.L. from R.H. At the hearing on July 19, 2019, the court found "there is insufficient evidence to substantiate by a preponderance of the evidence that domestic violence has occurred," and denied K.L.'s request for a DVPA order.

On December 3, 2019, K.L. filed a new request for a restraining order against R.H.[5] When R.H. arrived at the courthouse that same day, her conversation with court staff led her to believe she could not file a restraining order that day. She left and the following day—December 4, 2019—filed her request for a DVPA order against K.L.[6]

During his examination of R.H., K.L. acknowledged that his request for a DVPA order was based solely on claims that R.H. threatened him. K.L. specifically acknowledged that R.H. had never caused or attempted to cause him bodily harm, had never sexually assaulted him, and had never placed him in reasonable apprehension of imminent serious bodily injury to himself or anyone else.

During R.H.'s presentation of evidence supporting her request for a DVPA order, the trial court stated that evidence of three incidents of domestic violence was enough, and more would be repetitive. When R.H. requested that she be permitted to present evidence of more acts of violence, the court denied the request.

---

[5] The incidents mentioned in the December 2019 request that were not mentioned in the July 2019 request were: at the December 2, 2019 custody exchange, R.H. told K.L. "I'm going to fuck you up again. I'm not going to let you see our son again," called him a "faggot" and a "bitch," said "Fuck you and your mom she's a bitch too," and said she would "fucking kill" him before she let him see Z.L. again; on Talking Parents on September 9, 2019, asked "Do you like being a dick?"; and she refused to let him pick up Z.L. during K.L.'s scheduled parenting time on four occasions in November 2019.

[6] A second DVPA petition filed by R.H. was withdrawn at the hearing. The record on appeal does not include any information regarding this DVPA request.

11

On February 5, 2020, the court issued DVPA orders in favor of both K.L. and R.H. The court also issued a child custody and visitation order in connection with each DVPA order, granting K.L. and R.H. joint legal and physical custody of Z.L.

The trial court heard the two competing requests as "two separate trials." It first considered K.L.'s request against R.H. and found there was substantial evidence that (1) domestic violence or abuse by R.H. occurred within the meaning of Family Code sections 6203 and 6320; (2) R.H. was the perpetrator and K.L. was the victim of the violence or abuse; (3) the violence or abuse did not occur in self-defense; (4) the safety of K.L. and Z.L. would be jeopardized if the court did not issue the requested restraining order (*id.*, § 6340); and (5) a restraining order lasting three years was necessary to separate R.H. and K.L. for a sufficient period to enable them to seek resolution of the causes of the violence or abuse (*id.*, § 6220). The court identified the following facts supporting its finding that R.H. committed domestic violence against K.L.: (1) R.H. threatened K.L. at the December 2, 2019 custody exchange; (2) R.H. disturbed K.L.'s peace as set forth in the Talking Parents app exchanges submitted by K.L.; and (3) R.H. had previous criminal convictions that were "violent in nature." Given the court's previous ruling that the earlier denial of K.L.'s request for a DVPA order in July 2019 precluded the admission of evidence of R.H.'s alleged violence or abuse before that date, we presume that the court considered only the Talking Parents exchanges occurring after July 19, 2019; any reliance by the court on Talking Parents exchanges before that date in support of K.L.'s request for a DVPA order would be error.

The trial court also granted R.H.'s request for a restraining order against K.L. based on the "litany of issues and incidents," particularly those occurring in November 2017, April 2018, October 2018, November 2018, March 2019, October 2019,

12

and December 2019.[7] The court specifically found that R.H.'s mother, J.A., was a credible and reliable witness.

In connection with the issuance of mutual restraining orders (Fam. Code, § 6305), the court found that R.H. and K.L. "were both primary aggressors, neither one acted primarily out of self-defense."

After issuing the mutual restraining orders, the trial court addressed child custody. The court acknowledged that its findings of domestic violence and abuse by both R.H. and K.L. brought the rebuttable presumption of Family Code section 3044 into play. The court also acknowledged it did not "have time to address" all the factors to overcome the presumption. The court ordered that the parties would have joint legal and physical custody, with one week on and one week off.

R.H. filed a notice of appeal.

DISCUSSION

I.

*STANDARDS FOR ISSUANCE OF MUTUAL RESTRAINING ORDERS*

"Under the DVPA, a court may issue a restraining order to prevent domestic violence or abuse if the party seeking the order 'shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.'" (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 367.) "Abuse" includes intentionally or recklessly causing or attempting to cause bodily injury to, sexual assault, placing a person in reasonable apprehension of imminent serious bodily injury, attacking, striking, stalking, threatening,

---

[7] In his respondent's brief, K.L. argues that the trial court erred by considering a supplemental brief from R.H. that was filed and served fewer than five days before the hearing. At the hearing, the trial court gave K.L. the option to continue the hearing or to proceed and waive any objection to the supplemental declaration; K.L. chose the latter.

13

battering, harassing, destroying personal property, or disturbing the peace of the other party.  (Fam. Code, §§ 6203, 6320.)

The issuance of a mutual restraining order is governed by Family Code section 6305:

"(a) The court shall not issue a mutual order enjoining the parties from specific acts of abuse described in Section 6320 unless . . . :  [¶] . . . [¶]

"(2) The court makes detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense.

"(b) For purposes of subdivision (a), in determining if both parties acted primarily as aggressors, the court shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of Section 836 of the Penal Code."  (Fam. Code, § 6305.)  "'[D]etailed findings of fact'" under this statute "require sufficient factual findings or analysis for a reviewing court to assess the factual or legal basis for the trial court's decision."  (*In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 127.)

Penal Code section 836, subdivision (c)(3), provides as follows:

"The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor.  In identifying the dominant aggressor, [the court] shall consider (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense."  (Pen. Code, § 836, subd. (c)(3).)[8]

---

[8]  Although the statutes use different terms to describe the "primary aggressor," "dominant aggressor," and "most significant" aggressor, these terms are intended to be used interchangeably.  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2089 (2013-2014 Reg. Sess.) Apr. 22, 2014, p. 6.)

14

## II.

Mutual restraining orders issued under the DVPA are appealable. (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 601; see Code Civ. Proc., § 904.1, subd. (a)(6).) The trial court's custody orders are also appealable. (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1377; see Code Civ. Proc., § 904.1, subd. (a)(1) & (2).)

We review DVPA orders (*N.T. v. H.T., supra*, 34 Cal.App.5th at p. 601) and custody and visitation orders (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 662) for abuse of discretion. However, "'[t]he question of "whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review."'" (*N.T. v. H.T., supra*, 34 Cal.App.5th at pp. 601-602.) We review the court's factual findings for substantial evidence. (*J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 975.)

## III.

### THE TRIAL COURT ERRED BY ISSUING A MUTUAL RESTRAINING ORDER WITHOUT CONSIDERING THE STATUTORY REQUIREMENTS

Family Code section 6305 permits trial courts to issue mutual restraining order, but limits them to specific circumstances that are not present in the record before us. Indeed, the language of the statute makes clear that mutual restraining orders are the exception, and "shall not issue" unless the trial court makes specific findings, and that in making those findings the court "shall consider" both the intent of the law protecting domestic violence victims and the specific circumstances of the history of domestic violence in the case before it. (Fam. Code, § 6305; see Pen. Code, § 836, subd. (c)(3).) Specifically, the statute mandates that the court determine which of the parties is the "most significant" aggressor. (Pen. Code, § 836, subd. (c)(3).) Such a determination requires that the acts of the parties be weighed against each other. As a result, in

15

deciding whether mutual restraining orders should issue, the trial court must consider the parties' respective alleged acts of domestic violence in concert, and not separately, as the court did here. (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 372 ["By separating out for analysis each party's claim of abuse against the other, and issuing restraining orders against both parties as if incidents occurring at different times must be wholly unrelated, a court does not give full effect to the statutory directive that it 'shall consider' both 'the history of domestic violence between the persons involved' and 'protect[ing] victims of domestic violence from continuing abuse'"].)

In this case, the trial court failed to properly apply the statutory factors to the evidence before it.

The trial court found that the following acts by K.L. had been established by a preponderance of the evidence: (1) the November 2017 incident in which K.L. pointed a gun at R.H., punched her in the face, slammed her head into the nightstand, tore out her braids, and broke down a locked door; (2) the April 2018 incident where K.L. threw a microwave toward R.H. and H.H.; (3) the October 2018 incident where K.L. pushed R.H., who was then pregnant, off the bed, causing her to suffer an antepartum hemorrhage; (4) the November 2018 incident where K.L. hit R.H.'s mother in the nose; (5) the March 2019 incident in which K.L. drugged and sexually assaulted R.H.; (6) the October 2019 incident in which K.L. pulled R.H. off the bed, causing her to hit her head on the floor, kicked her out of his apartment, caused her to bang heads with year-old Z.L., strangled her, destroyed her phone, and smashed her head into a metal area of her car; and (7) the December 2019 incident in which K.L. punched R.H. in the head after the trial court had granted a temporary restraining order protecting R.H. from K.L.

The trial court also found by a preponderance of the evidence that R.H.: (1) threatened K.L. at the December 2, 2019 custody exchange by saying she was going to "fuck him up" and threatening to kill him; (2) disturbed K.L.'s peace as set forth in the

16

Talking Parents app exchanges submitted by K.L.; and (3) had previous criminal convictions that were "violent in nature."

Based on the foregoing evidence of the parties' acts of domestic violence, the trial court found that both K.L. and R.H. acted as primary aggressors and that neither acted primarily in self-defense. (Fam. Code, § 6305, subd. (a)(2).) In making these findings, however, the trial court failed to consider the mandatory factors of Penal Code section 836, subdivision (c)(3). Specifically, the trial court failed to consider the intent of the DVPA and other laws protecting victims of domestic violence from continuing abuse, whether either party made the threats to the other creating fear of physical injury, and the history of domestic violence between K.L. and R.H.

The evidence before the trial court regarding the parties' behavior at the December 2 custody exchange does not rise to the level of threats by R.H. sufficient to justify the issuance of a restraining order. K.L. admitted at the hearing that R.H. had never placed him in reasonable apprehension of imminent serious bodily injury to himself or anyone else. This testimony should have been relevant to the trial court's analysis under Penal Code section 836, subdivision (c)(3)(B). R.H. said she would "fuck up" K.L. and kill him *after* she had observed the bruise on Z.L.'s head, seeing that K.L. had shaved Z.L.'s head against the doctor's recommendation, and having K.L. state that he had shaved Z.L.'s head as a means of punishing R.H. Moreover, R.H.'s words came after more than two years of substantiated physical, emotional, and sexual abuse of R.H. by K.L. The trial court failed to consider this history of domestic violence under Penal Code section 836, subdivision (c)(3)(C).

The statements by R.H. to K.L. on Talking Parents, while evidencing a lack of ability between these two people to communicate, do not reach the level of disturbing K.L.'s peace. "'[T]he plain meaning of the phrase "disturbing the peace of the other party" in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party.'" (*N.T. v. H.T., supra*, 34 Cal.App.5th at p. 602.)

17

What disturbs the peace of a person differs in each case. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 603-604 [tracking girlfriend's cell phone]; *N.T. v. H.T., supra,* 34 Cal.App.5th at p. 602 [communicating with wife about issues in excess of those necessary to custody exchanges, stalking wife, verbally attacking wife and threatening her regarding visitation]; *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 400-401 [physical abuse of couple's children destroyed one partner's calm and made her fear for her own safety and that of her children, although she herself was not physically abused]; *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 822 [acts of isolation, control, and threats that destroyed protected party's mental and emotional calm; acts continued despite restrained party's knowledge of adverse consequences to protected party's health and pregnancy]; *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1144 [contacting plaintiff by phone, e-mail, and text; arriving at her home unannounced and uninvited, and refusing to leave]; *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498-1499 [husband publicly disclosed content of wife's confidential e-mails, causing her to suffer "'shock'" and "'embarrassment,'" to fear the destruction of her "'business relationships,'" and to fear for her safety]; but see *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13 [single private Facebook post is not sufficient to disturb the other party's peace].)

In this case, calling K.L. a "dick" and failing to show up for custody exchanges is not sufficient to disturb anyone's peace, especially if that person has been physically and emotionally abusing the other person for almost two years. Pursuant to Penal Code section 836, subdivision (c)(3)(A), (B), and (C), these words and actions do not justify a finding that R.H. was the dominant aggressor or that R.H. was not acting in self-defense. This conclusion does not condone or approve R.H.'s words or actions, but recognizes they simply do not rise to the level required by the law.

Finally, the trial court erred as a matter of law by relying on R.H.'s previous criminal convictions in ordering the issuance of a mutual restraining order.

18

Family Code section 6306, which the trial court cited in explaining why it was considering R.H.'s convictions, provides, in relevant part: "(1) Prior to deciding whether to issue an order under this part or when determining appropriate temporary custody and visitation orders, the court shall consider the following . . . : any conviction for a violent felony specified in Section 667.5 of the Penal Code or a serious felony specified in Section 1192.7 of the Penal Code; any misdemeanor conviction involving domestic violence, weapons, or other violence; any outstanding warrant; parole or probation status; any prior restraining order; and any violation of a prior restraining order. [¶] (2) Information . . . that does not involve a conviction described in this subdivision shall not be considered by the court in making a determination regarding the issuance of an order pursuant to this part. That information shall be destroyed and shall not become part of the public file in this or any other civil proceeding." (Fam. Code, § 6306, subd. (b).)

R.H.'s misdemeanor convictions for child endangerment and second degree burglary are neither felony convictions nor misdemeanors involving violence; nor are they within the categories specified in Family Code section 6306, subdivision (b)(2). Therefore, the court should not have considered them in deciding whether to issue mutual restraining orders, or in connection with the issue of custody.[9]

While the trial court defined R.H.'s crimes of child endangerment (Pen. Code, § 273a) and second degree burglary (*id.*, §§ 459, 460) as "violent," they are not listed as "violent" felonies under Penal Code section 667.5, subdivision (c), or as "serious" felonies under Penal Code section 1192.7, subdivision (c). More importantly, these crimes do not meet the definition of "violent." Violent crimes involve "physical force, sexual contact, physical injury or destruction of property, fear, coercion, or duress." (*In re Febbo* (2020) 52 Cal.App.5th 1088, 1102.) Nothing in the record shows

---

[9] Given the requirement of Family Code section 6306, subdivision (b)(2), we direct the trial court to destroy the portions of the trial court's record that include references to R.H.'s previous criminal convictions.

19

these crimes were violent under the *In re Febbo* definition. Moreover, these crimes had no connection to the acts of violence between K.L. and R.H.; they were committed before these two individuals even began a dating relationship, and were not committed against K.L.

"It is essential in a case such as this that the court rigorously evaluate the evidence to ensure that the moving party has, in fact, been victimized. This is so, particularly, where, as here, the trial court is aware that the acts *committed* by the moving party . . . are significantly more violent than the acts *alleged* by the moving party." (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 205.) The acts committed by K.L. against R.H. were significantly more violent than the acts committed against K.L. by R.H. The trial court failed to evaluate the evidence before it in light of the Penal Code section 836, subdivision (c)(3) factors, and therefore erred in finding that R.H. was an aggressor who did not act in self-defense. The mutual restraining order therefore cannot stand.[10]

## IV.

*SUBSTANTIAL EVIDENCE SUPPORTS THE DVPA ORDER AGAINST K.L.; SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE DVPA ORDER AGAINST R.H.*

As discussed above, substantial evidence supported the trial court's issuance of a restraining order protecting R.H. and H.H. against K.L. (Fam. Code, §§ 6300, 6320.) However,, the trial court's DVPA order restraining R.H. was not supported by substantial evidence, and must be reversed. (*Ibid.*)

---

[10] Amici curiae have raised many important points regarding the negative effects of mutual restraining orders on women, particularly women of color and women who have been the targets of domestic violence. While we recognize and appreciate the issues raised by amici curiae, the appropriate forum in which to address their concerns is the Legislature. We are limited to the record before us.

*THE TRIAL COURT'S ORDER REGARDING CUSTODY OF Z.L. IS REVERSED; IF, AFTER THE DEPENDENCY PROCEEDING INVOLVING Z.L. IS RESOLVED, EITHER PARTY FILES A REQUEST FOR ORDER CONCERNING Z.L.'S CUSTODY, THE TRIAL COURT MUST CONSIDER THE CUSTODY ISSUE WITH REGARD TO FAMILY CODE SECTION 3044'S REBUTTABLE PRESUMPTION AGAINST GRANTING CUSTODY TO K.L.*

Family Code section 3044, subdivision (a), creates a rebuttable presumption that sole or joint physical or legal custody of a child to a person who has committed domestic violence against the other party seeking custody is "detrimental to the best interest of the child." In this case, the trial court found that the rebuttable presumption came into play because both R.H. and K.L. had been found to have committed acts of domestic violence against the other. The trial court did not, however, address the factors that can overcome the presumption, which are set forth in Family Code section 3044, subdivision (b), on the record. The court also acknowledged it did not "have time to address" all the factors to overcome the presumption: "[Family Code section] 3044 presumptions are now in play. [Family Code section] 3044 presumptions that can only be overcome by certain subsections of [Family Code section] 3044 including batterers intervention attendance, anger management classes, and a whole other laundry list of items in [Family Code section] 3044. [¶] We're not going to have time to address every single subsection, so my inclination is to grant joint physical and legal custody."

In light of the trial court's error in finding that R.H. was a primary aggressor and did not act in self-defense, its order granting joint physical and legal custody to K.L. and R.H. cannot stand.

Although it is not a part of the appellate record in this case, the parties agree that a dependency case involving Z.L. was initiated after the mutual restraining orders in the present case were issued, and is currently pending. As long as a child is a dependent of the juvenile court, "any issues regarding custodial rights between his or her

21

parents shall be determined solely by the juvenile court." (Welf. & Inst. Code, § 302, subd. (c).) Therefore, until the dependency matter is resolved, the trial court may not make any orders regarding the issue of K.L. and R.H.'s custody over Z.L.

After the dependency matter is resolved, the trial court shall consider any new requests for order filed by the parties regarding legal and physical custody of Z.L. pursuant to Family Code section 3044.[11]

## DISPOSITION

The restraining order against R.H. is reversed. The restraining order against K.L. is affirmed. The orders regarding custody of Z.L. are reversed. We direct the trial court, pursuant to Family Code section 6306, subdivision (b)(2), to destroy information regarding R.H.'s criminal history that is not encompassed by Family Code section 6306, subdivision (b)(1).

---

[11] Recently, in the context of a juvenile dependency case, we cautioned against the danger of implicit bias affecting the judiciary's perception of victims of domestic abuse. "We are also mindful of society's preconceptions that often damage the 'credibility of victim-witnesses who present on the stand in atypical and non paradigmatic fashions.' (Kohn, Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses (2003) 11 Am. U. J. Gender Soc. Pol'y & L. 733, 734, fn. omitted.) We expect such victims to be 'sweet, kind, demure, blameless, frightened, and helpless' (*id.* at p. 734) and 'not a multi-faceted woman who may or may not experience fear or anger' (*id.* at pp. 743-744, fn. omitted). 'These are the preconceptions that judges and jurors bring with them into the courtroom when they assess the veracity of a victim-witness's story.' (*Id.* at p. 734, fn. omitted.) We encourage continued diligence and education to guard against such preconceptions." (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 26.) While not directly applicable to our analysis, we encourage the trial court to keep this in mind in this and other matters.

The parties shall immediately forward a copy of this opinion to the juvenile court in dependency case No. 21DP0311.

Appellant R.H. is to recover her costs on appeal.


ZELON, J.*

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/26/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| K.L., | |
| Plaintiff and Respondent, | G059109 |
| v. | (Super. Ct. No. 18P001978) |
| R.H., | O R D E R |
| Defendant and Appellant. | |

Appellant and nonparties Family Violence Appellate Project joined by Alliance for HOPE International, California Protective Parents Association, Center for Community Solutions, Child Abuse Forensic Institute, Coalition for Family Harmony, Domestic Abuse Center, Margaret Drew, Family Violence Law Center, Law Foundation of Silicon Valley, Los Angeles County Bar Association Counsel for Justice Domestic Violence Project, Los Angeles Center for Law and Justice, Public Counsel, Julie Saffren, Stopping Domestic Violence, and University of California Davis Family Protection and Legal Assistance Clinic, and Horowitz & Levy have requested that our opinion filed on September 30, 2021, be certified for publication. It appears that our opinion meets the

standards set forth in California Rules of Court, rule 8.1105(c).  The request is
GRANTED.  The opinion is ordered published in the Official Reports.


                                        ZELON, J.*

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief
Justice pursuant to article VI, section 6 of the California Constitution.