Filed 1/31/22  D.R. v. A.R. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| D.R., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> A.R., <br><br> Defendant and Respondent. | D078079 <br><br><br> (Super. Ct. No. 20FDV00550C) |

APPEAL from an order of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed.

SMJ Legal Services and Sherri-Marie St. Cyr, for Plaintiff and Appellant.

Law Offices of Thomas D. Ferreira and Thomas D. Ferreira, for Defendant and Respondent.

Appellant D.R. (Mother) appeals from an order denying her request for a domestic violence restraining order against her former spouse A.R. (Father).  (Fam. Code, § 6300.)[1]  During a custodial exchange of their five-

---

[1]     Unless otherwise indicated, statutory citations are to the Family Code.

year-old son, Mother claimed that Father approached her aggressively, tapped and then banged on her car window, and demanded to talk to her. After the court issued a temporary restraining order, Mother complained that Father violated the order by forcing "face-to-face" exchanges of the child and sending his ex-wife and a nanny to Mother's house to exchange the child rather than exchanging him at his preschool. Following an evidentiary hearing, the trial court concluded that Mother failed to meet her burden of proof and denied her request for a permanent restraining order. Mother appeals, contending the court erred in denying her request. We reject Mother's contentions and affirm the court's order denying her request for a permanent restraining order.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father were married in 2014 and divorced in 2017. They share custody of their son, who was born in 2015. Pursuant to an order entered in Orange County Superior Court in November 2019, the parents were spending two days during the week and every other weekend with the child. The custody order provided that exchanges of the child would occur with one parent dropping the child off at school and the other parent picking the child up from school.[2]

On February 11, 2020, Mother filed a request for a domestic violence restraining order, stating that the most recent incident of abuse occurred on January 31, 2020, at a custodial exchange following a court hearing in

_____

[2] The reference to exchanges at "school" appears to have been a reference to the child's preschool or daycare facility.

2

Orange County.[3]  She did not identify any prior alleged abuse.  Mother described the January 2020 incident, stating that Father had picked up their child from school in San Diego and brought him to Orange County, "knowing he would not make it back to San Diego" for the custodial exchange that was scheduled to occur at 5:30 p.m. at the child's school.  Mother stated that Father "baited [her] to the deserted portion of [a] parking lot to exchange [their] son.  He was waiting for [her] outside his car [and] was quickly coming towards [her] car when [she] parked."  Mother further described the alleged incident as follows:  Father "came towards me cursing [and] demanding I talk to him.  He got in my face [and] I wasn't sure if he was going to hit me, so I started walking backwards to my car [and] told him nerves are on edge since court today [and] we should speak another time.  I told him I would wait [until] 5:30 (the exchange of our son time since it was my Friday, per our custody agreement) [and] got back in my car.  This made him more mad [and] he started tapping on my window so hard I thought he would break it.  He was demanding I roll my window down [and] I did slightly to try to get him to quit hitting my window.  This made him even more mad as he demanded I get out of the car or roll my window all the way down.  I told him to stop

---

3      Father states this court should disregard the pleadings and declarations contained in the clerk's transcript—and Mother's citations thereto—and limit our consideration to the parties' testimony at the hearing. Father claims, without citation, that "[t]he trial court did not indicate that it had considered the parties' pleadings and declarations, nor had it considered any evidence other than the . . . exhibits it received." However, the trial court informed the parties it would "rely on whatever evidence is presented today" "*in terms of testimony*," and notified the parties it was "familiar with the file." (See § 6301, subd. (c) [trial court must "consider the totality of the circumstances in determining whether to grant or deny a petition for relief"].) Both parties agreed to this approach. Because it appears the trial court did not rely exclusively on testimony, we will consider the parties' written declarations.

[and] was searching for my phone to call the police. Because I didn't follow his demands he said he was taking our son. He then went to his car [and] left." Mother stated she "called the police [and Father] returned [their] son." She further stated: Father "now refuses to return our son to school [and] forces exchange[s] with him outside the school since [January 31, 2020]. I do not feel safe being around [Father] until things calm down. Our custody case is on [February 14, 2020]."

The court issued a temporary restraining order and set the matter for a hearing on February 28. The temporary restraining order directed Father not to "do the following things" to Mother: "[h]arass, attack, . . . [or] disturb the peace," "[c]ontact, either directly or indirectly, in any way, including but not limited to, by telephone, mail, e-mail or other electronic means," or "[t]ake any action, directly or through others, to obtain [her] address[] or location[]." The order also required Father to stay 100 yards away from Mother, her home, job and vehicle, but carved out an exception for "[b]rief and peaceful contact with [Mother], and peaceful contact with children . . . as required for court-ordered visitation of children . . . ."

Father filed a response to Mother's request for a restraining order. He explained his version of the incident that occurred in the parking lot, stating that he and Mother had a court hearing in Orange County earlier that afternoon. After court, he "picked up [his] son and sent a text to [Mother] explaining that [he] would be [two] hours late to [their] 5:30[ p.m.] San Diego exchange because [they] were in [Orange County] for the hearing." When they instead agreed to meet in an Orange County parking lot, he approached Mother's vehicle and asked if they could speak "because [their] son was still [asleep]" in the back of his vehicle and in the past Mother declined to speak while the child was present. Father explained that earlier in court, the judge

4

had suggested they "try to resolve [their] issues" regarding the shared custody of their son and he thought this was a good opportunity to talk. Mother refused to speak with him because it was several minutes before their scheduled exchange time. She rolled her window up as he began to speak. He knocked on the window and told her he would leave. After she rolled the window down again, he said he was there to accommodate her, and that they could exchange in San Diego per their custody agreement "if [she was] going to be rude." When she said she would call the police, he replied "[c]all them." He left, got gas, and then returned and exchanged their son. The police arrived and Mother gave a statement. Father stated that once the police arrived, Mother exited her vehicle and started "crying uncontrollably." Father later approached the officer and offered to cooperate. In his response to the restraining order request, Father explained that he believed Mother was seeking a restraining order "for the sole purpose of attempting to influence the [j]udge to limit [his] time with [their] son." He denied coming toward Mother "cursing and demanding to talk"; denied getting "into her face"; denied "bait[ing] her to a deserted portion of [the] parking lot"; and denied that he was "upset or angry."

Mother, who had filed the initial restraining order request in propria persona, retained counsel and filed a supplemental declaration in support of her restraining order request. She stated that Father "was verbally abusive" during their marriage after their son was born and "used his physicality to intimidate [her]."[4] She stated Father would call her " 'fat,' " " 'unintelligible,' " " 'stupid,' " " 'stupid bitch,' " and "a 'back wood's redneck' "

---

[4]    Mother did not sign this declaration under penalty of perjury. However, she testified that the contents of both of her supplemental declarations were accurate (with one minor exception not relevant to this appeal).

[*sic*]. She acknowledged that Father never hit her but stated he "would get in [her] face," "use his body [to] push [her]," and "raise his hand as if he was going to hit [her] or push [her] back against a wall." Their custody agreement ensured that exchanges of their son were to occur at school in a manner that did not require contact between the parties, and Mother believed that on January 31, Father "forced a private exchange" because "he wanted to intimidate [her] and try to force [her] to agree to his custodial request." She stated that Father was yelling and angry at the exchange in the parking lot, he repeatedly hit her car window and raised his fist, and she was "afraid he was going to punch [her]." She called the police after he "ran back to his truck and erratically drove off with [their] son." She stated that she filed the request for a restraining order after Father subsequently "force[d] another face to face exchange on February 6." She attached to her declaration copies of text messages she and Father exchanged in 2019 in which they argued about custodial time, both called the other a "liar," and Father called Mother a "crazy psycho" and "savage."

In a second supplemental declaration filed prior to the evidentiary hearing, Mother described additional exchanges of the child that she felt were problematic. One morning in March 2020, while in Father's care, the child broke three toes, and Father notified Mother of the incident later that afternoon by e-mail. After the child's school notified Mother that it was a safety issue for the child to attend if he was not "ambulatory," the parents attempted exchanges at a police station and using a supervised visitation and exchange center. Around this time, the child's school announced it was restricting attendance due to COVID-19, but the child was permitted to continue attending for the sole purpose of exchanges. On April 16, Father arrived at the school to exchange the child at the same time Mother was

6

there to drop him off.  Mother said she was "trying to avoid any contact" with Father and she was "freaked out" by his presence.  She took the child inside the school and had a teacher escort the child outside to Father.  Mother acknowledged that Father told her he did not want to do exchanges at the child's school because "he felt 'unsafe' " and "did not want to unnecessarily expose [the child] to COVID-19."  Shortly thereafter, the school notified the parents they would no longer accommodate "exchange only services."  Mother claimed that Father forced "face-to-face" exchanges of their son, and sent his "abusive ex-wife" and a nanny to Mother's home to exchange the child, without Mother's consent.  She claimed she was "terrorized" by Father's conduct and that his "disregard for the custody order is how he has harassed and intimidated [her], and how he's disturb[ed] [her] peace."

Father denied many of Mother's allegations and argued that most of the incidents underlying Mother's complaints were "related to COVID-19."

After multiple continuances, the parties appeared in court in June.  At this hearing, Father asked the court if he was able to attend medical evaluations related to the child's foot injury.  The trial court responded: "Joint legal custody means that you both have equal rights and responsibilities to make all decisions affecting the health, welfare, and education of your child.  That means you have equal responsibility and equal rights to make those decisions.  You are to consult with each other.  And if the child is in your custodial time and you need to seek medical care, then you do so in consultation with the other parent."  Because the court had not yet received all the filed papers, the parties agreed to continue the hearing on the restraining order until July.

In July, when the parties appeared for the hearing on the restraining order request, the trial court judge who had presided over some of the parties'

7

prior proceedings was not available, so they appeared before a different trial court judge. The judge indicated that, while he was not present for the prior proceedings, he was "familiar with the file." And, "in terms of testimony," the court stated it would "rely on whatever evidence is presented today." The parties agreed to proceed in this manner.

Mother testified to some of the incidents described in her declarations. Father testified, acknowledging that he met Mother in the parking lot in January 2020 to exchange the child, and admitted he asked to speak to her and left to get gas when "she said that she was not going to exit her vehicle until 5:30 because 5:30 was the exchange time," and "[he] had three minutes so [he] went to get gas." He denied that he "demand[ed]" to talk to her and denied he "banged with a closed fist on her window demanding that she roll the window down." Father acknowledged he sent two people to Mother's house to exchange the child and acknowledged he and Mother had other disagreements involving the exchange of the child. Father suggested that Mother had filed the restraining order request to "[game] the system and get an advantage as it relates to custody."

At the close of Mother's case, the trial court referred to Father's assertion that "the request for the restraining order is really being done to get an advantage in the custody proceeding." The court asked the parties to address whether Mother's evidence was "sufficient to justify issuance of a restraining order" "because this is not a case where there's been an allegation that an incident—that is prompting seeking the restraining order is, you know, a physical fight or a threat of bodily harm. And I totally understand that that's not the only circumstances that can justify a restraining order. But I do want you to address the basis that you are relying

8

on and why you believe the evidence that you presented is sufficient to meet the burden of proof."[5]

Mother argued that a protective order was authorized on a showing of "past acts or active abuse,"[6] and abuse was not limited to incidents of physical injury or assault, but rather was defined broadly to include several types of nonviolent conduct. She contended that Father's conduct constituted "harassment, contacting [her], either directly or indirectly, to intimidate and disturb[] [her] peace of mind," and thus amounted to conduct subject to a restraining order under section 6320. Mother further argued that Father had knowingly violated the restraining order by "disturbing the peace" of the protected party, and such behavior should not be characterized as a de minimis or technical violation. Mother argued "any violation of the [temporary restraining order] is in itself an act of abuse and it's grounds for the issuance for a permanent restraining order."

Father argued that Mother's claims of harassment were insufficient to justify imposing a restraining order. He argued that he and Mother disagreed about their respective obligations under the custody agreement and further disagreed about placing the child in daycare during the COVID-19 pandemic. Father argued he did not want to keep the child at school because the facility was caring for children of emergency workers, which Father

---

[5]     The court later framed the issue, asking Father, "because there's no allegation of physical violence here, whether the evidence that [Mother] presented about allegations of harassment . . . should be viewed by the Court as sufficient to meet their basic burden of proof."

[6]     The reporter's transcript may contain a typographical error or counsel perhaps misspoke; section 6300, subdivision (a) authorizes the court to issue a restraining order based on "reasonable proof of a past *act or acts of abuse*"—not "active abuse." (Italics added.)

9

believed meant "those were high-risk kids at that facility."  Father claimed he sent people to Mother's house to exchange the child to minimize the child's potential exposure to COVID-19 and to prevent his direct contact with Mother.

The trial court denied Mother's request for a restraining order, finding she had not met her burden of proof.  The court addressed Mother's claims regarding the alleged violations of the temporary restraining order, as well as the alleged incident in the parking lot.  The court acknowledged that violating a custody order might constitute abuse or harassment under certain circumstances, but concluded that the evidence in this case was not sufficient to support the issuance of a restraining order.

The trial court stated:

> "Even accepting [Mother's] version of the incidents that occurred, some of which [Father] is disputing.  But even accepting her version of what happened, I don't believe that what's been presented shows anything beyond disputes and disagreements about what's a proper way of engaging in the custody exchanges.

> "And even if [Father] is totally wrong in deciding when and where custody exchanges that he was going to engage in or have engaged in, that to me is an issue [to be] addressed by the custody court.

> "If . . . we allow restraining orders to be issued every time one parent says the other parent is intentionally not complying with the custody order, then every case is going to—not every case, but many, many cases are going to have restraining orders, and I don't think that that's what the [L]egislature intended.

> "The issue about complying with the custody order, part of the problem is that the temporary restraining order has a provision saying that it permits peaceful compliance with the custody order.  And so [Mother] cannot just unilaterally decide that if [Father] does something, that that's not

10

peaceful . . . —that she doesn't want a particular person involved in an exchange."

The court found that Father's behavior of sending other people to Mother's home to exchange the child did not constitute harassment in the context of this case. The court noted Father's actions might warrant a modification to the custody order, but the evidence before it was not sufficient to necessitate a permanent restraining order. The court stated: "If he is unilaterally violating the custody order left and right, then that may cause the Court to cut back his custody. I'm not making a determination about that. I'm determining whether the allegations that he has been engaging in this conduct that's against the custody order, if that is sufficient to constitute grounds for a restraining order. I do not believe it is. I do not believe the evidence presented shows sufficient evidence to grant the restraining order." The court further noted as to Father's handling of the exchanges, "I think [Mother] brushes aside the impact of COVID, and I think that that's not fair to do."

Similarly, the court concluded Mother's allegations regarding the incident in the parking lot were not sufficient to warrant a restraining order. The court explained:

> "The incident that resulted in [Mother] coming to court to ask for a restraining order is the incident in the [parking] lot. I don't believe that the description that's been presented of that incident constitutes abuse justifying a restraining order. I think it is—because not all name calling or yelling or accusations or disagreement are sufficient for a restraining order.

> "Again, I think the incident demonstrates a claim that [Father] was supposed to comply with a custody order, was supposed to do an exchange, and had his own agenda and wanted to deal with that, as opposed to just, you know, exchanging the son and leaving. And I think that's a

11

matter for the custody court to deal with. I don't think it's a demonstration of sufficient abuse to constitute a preponderance of the evidence in this case."

Mother appeals the court's denial of her request for a restraining order.

DISCUSSION

The purpose of the Domestic Violence Prevention Act (DVPA; § 6200 et seq.) is "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)[7] To effectuate this purpose, trial courts may issue a restraining order based on "reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a); *In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 225 (*Marriage of Davila*).) "The DVPA requires a showing of past abuse by a preponderance of the evidence." (*Marriage of Davila, supra,* 29 Cal.App.5th at p. 226.)

"Abuse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Rather, " 'abuse' " includes causing or attempting to cause bodily injury (*id.*, subd. (a)(1)), "plac[ing] a person in reasonable apprehension of imminent serious bodily injury" (*id.*, subd. (a)(3)), and behavior such as "stalking, threatening, . . . harassing, . . . contacting, either directly or indirectly, . . . or disturbing the peace of the other party" (§ 6320, subd. (a); see § 6203, subd. (a)(4)). " '[T]he plain meaning of the phrase "disturbing the peace of the other party" in section 6320 may be

---

[7] Prior to its amendment in 2014, this provision stated that the statutory "purposes of [the DVPA] are to prevent *the recurrence of* acts of *violence* and sexual abuse and to provide for a separation of the persons involved . . . ." (Stats. 1993, ch. 219, § 154 [former § 6220], italics added.) The amendment deleted the phrase "the recurrence of" and replaced "violence" with "domestic violence, abuse." (Stats. 2014, ch. 635, § 3.)

properly understood as conduct that destroys the mental or emotional calm of the other party.' " (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602 (*N.T.*); see also § 6320, subd. (c) [amending the statute effective January 1, 2021 to define " 'disturbing the peace of the other party' " consistent with this caselaw].)

Generally, we review a trial court's denial of a domestic violence restraining order for abuse of discretion (*Marriage of Davila*, *supra*, 29 Cal.App.5th at p. 226), we review a court's factual findings for substantial evidence (*ibid.*), and we review a trial court's determination of a question of law de novo (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 560).

Mother argues that there was ample evidence of harassing, threatening, and abusive conduct to justify issuing a permanent restraining order. But the question before us is not whether substantial evidence exists to support a finding of abuse within the meaning of the DVPA. Mother bore the burden of proof as the moving party seeking a restraining order. Because the trial court found she failed to meet her burden of proof, " ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270; accord *In re S.G.* (2021) 71 Cal.App.5th 654, 671 (*S.G.*) [applying this standard of review to the denial of an analogous restraining order pursuant to Welf. & Inst. Code, § 213.5].)

Mother has not made the requisite showing to prevail here. The evidence regarding the parking lot incident was not uncontradicted. The

13

parties' accounts differed on material points. Viewed in the light most favorable to the court's ruling, the evidence shows Mother refused to speak to Father prior to their scheduled custody exchange, Father attempted to get Mother to speak with him by tapping on the window to ask her to roll her window down, Father told Mother she was being rude and left to get gas, and Father cooperated with the police after he returned and exchanged the child with Mother. Father denied that he was aggressive or angry during the exchange. Father also denied his subsequent actions—including sending third parties to conduct exchanges and picking the child up at school earlier than Mother expected—were intended to harass Mother or disturb her peace. Instead, he explained he was concerned about his safety and the child's exposure to COVID-19. The court apparently credited Father's explanations—concluding that Mother "brushes aside the impact of COVID"—and we do not reweigh credibility determinations on appeal. (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486; see *Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257 ["absent an express credibility finding, we must infer the trial court resolved questions of credibility in a manner that supports its findings and order"].)

Even assuming Mother's account of the alleged incidents was largely accurate, substantial evidence supports the court's finding that the parties were involved in a custody dispute that did not rise to the level of abuse within the meaning of the DVPA. We acknowledge Mother asserted she was upset by Father's actions. As the Court of Appeal explained in *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13, however, a trial court is not compelled to issue a restraining order "based on any act that upsets the petitioning party. The DVPA was not enacted to address all disputes between former couples, or to

14

create an alternative forum for resolution of every dispute between such individuals." Here, the trial court found that "not all name calling or yelling or accusations or disagreement are sufficient for a restraining order." The court further found the evidence failed to show "anything beyond disputes and disagreements about what's a proper way of engaging in the custody exchanges." We will not reverse the trial court's decision unless the trial court " ' " 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances." ' " (*Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 223.) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) Applying these principles to the record here, we cannot say no judge would reasonably have made the same decision denying Mother's request for a restraining order. (See *id.* at p. 781 [affirming order denying request for restraining order where trial court's findings of fact were supported by substantial evidence and trial court applied proper legal principles]; see also *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1265-1266 [father's "badgering" conduct of mother during custodial dispute did not rise to the level of harassment or abuse to support the issuance of a restraining order]; *K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981 [offensive name-calling and failing to show up at custody exchanges demonstrated a lack of ability to communicate but did not reach the level of disturbing the peace of the party seeking the restraining order].)

Mother also argues the court applied the wrong legal standard in denying her request. She makes two arguments to support this claim. First, Mother argues the DVPA broadly defines "abuse" to include non-violent acts.

15

But the court understood this principle. When asking the parties to address whether Mother's evidence was sufficient to warrant the issuance of a restraining order, the trial court stated it "totally" understood that a "physical fight or a threat of bodily harm" were not the sole grounds for issuing a restraining order. The record demonstrates that the court applied the correct legal standard and understood that abuse is defined broadly under the DVPA. Second, Mother argues violations of a temporary restraining order are sufficient to support a permanent restraining order. Both parties recognize that violations of a temporary restraining order *may* support the issuance of a permanent restraining order. (See *N.T.*, *supra*, 34 Cal.App.5th at pp. 597-598.) Nonetheless, a trial court is not *compelled* to issue a restraining order where it concludes, based on the totality of the evidence, that a restraining order is not warranted. (See § 6300, subd. (a) ["An order *may* be issued under this part to restrain any person for the purpose specified in Section 6220" where the evidence "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."], italics added.) Moreover, in this case there were no findings made that Father violated the temporary restraining order. To the contrary, the trial court expressly declined to accept Mother's claim that Father violated the temporary restraining order. Instead, the court found that the temporary restraining order expressly allowed for "[b]rief and peaceful contact" with Mother for purposes of court-ordered child visitation. There was substantial evidence to support the court's conclusion that Father did not violate the temporary restraining order. Instead, the parties were involved in a custody dispute and Father's actions did not rise to the level of abuse within the meaning of the DVPA.[8] We cannot conclude no reasonable judge would have

---

[8] The temporary restraining order did not include (and Mother did not

16

reached the same decision after considering Mother's claim that Father's actions violated the temporary restraining order and disturbed her peace. (*S.G.*, *supra*, 71 Cal.App.5th at p. 672 [mother's testimony regarding father's alleged history of domestic violence, "as well as her testimony that [f]ather violated the 2019 temporary restraining order by parking near her driveway" was not " ' "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support" ' the requisite finding— namely, that a permanent restraining order was necessary to protect [m]other's safety."].)  We therefore reject Mother's contention that the court misapplied the law in evaluating her claims.

Although the majority of the evidence presented to the trial court involved the parties' custody dispute, Mother also testified briefly about two prior incidents of alleged abuse during the parties' marriage.  As set forth *ante*, Mother contended in her first supplemental declaration that Father "was verbally abusive" during their marriage and "used his physicality to intimidate [her]."  At the evidentiary hearing, Mother briefly described these two alleged incidents.  During the first incident, Mother alleged that Father was unsatisfied with her responses to his questions and he apparently

---

request) any orders regarding custody and visitation.  The custody and visitation order was issued by the Orange County Superior Court, and the parties were permitted to have brief and peaceful contact with one another under the temporary restraining order to exercise their court-ordered custody and visitation.

positioned himself "over" her while she sat on a recliner.[9] During the second incident, Mother alleged that Father "cornered" her with his body while asking for her opinion on something.[10] Mother relies on this evidence to support her argument that "ample evidence" supported the issuance of a restraining order. As we have already explained, the question before this court is not whether Mother can point to substantial evidence to support the issuance of a restraining order. (See *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 ["The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment."].)[11] Even assuming that these incidents were sufficient to support a finding of past abuse, the court

---

[9] Specifically, Mother testified as follows regarding the first incident, which occurred in 2015 before the child turned a year old: "[W]hen I wasn't answering the way he wanted or answering fast enough or giving him what he wanted, he was over me in his recliner chair. I had [the child] in my left hand, and he was yelling at me saying that I'm stupid and I don't know what I'm talking about. And he was asking me for—to respond and answer his question. And I didn't know the subject very well so I wasn't able to give him the answer. And then I reminded him [the child is] in our arms and to please stop, which he did."

[10] Specifically, Mother testified as follows regarding the second incident: "It's always about something that he had looked up and wanted to know more, if I knew something about this. And he needed to know my opinion on it and where I stood because he didn't like how my family was. [¶] And he had me cornered on the wall where he was, with his body pushed up against me. And I had [the child] in my right arm and he was again in my face. And I was, '[Father], stop. [The child is] with me. Stop right now.' [¶] And he got mad and he just pushed his hand up against the wall, turned around and walked out the door."

[11] We therefore are not persuaded by Mother's citations to cases describing actions that are sufficient to constitute abuse, or to cases affirming a court's discretionary decision to grant a permanent restraining order.

reasonably could conclude a sufficient period of separation had elapsed and a permanent restraining order was not needed based on the record before it. (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1499, fn. 8 ["the fact that a trial court finds past abuse does not require that the court issue a restraining order; rather, a court may decline to issue a restraining order"].)

In sum, Mother has not affirmatively shown the trial court was compelled by the evidence to find that Father committed an act of abuse under the DVPA and to grant a restraining order. Contrary to Mother's assertions, the trial court did not commit legal error in denying her request. The court made factual findings supported by substantial evidence to support its decision. Viewing the record in the light most favorable to the court's ruling, we cannot conclude the trial court abused its discretion in denying Mother's request for a restraining order.

DISPOSITION

The order denying Mother's application for a permanent restraining order is affirmed. Father may recover his costs on appeal.


GUERRERO, J.

WE CONCUR:



AARON, Acting P. J.



DATO, J.

19