Filed 5/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| G.G.,<br><br>    Petitioner and Appellant,<br><br>    v.<br><br>G.S.,<br><br>    Respondent. | B331994<br><br>(Los Angeles County<br> Super. Ct. No. 20STPT02557) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis F. Hernandez, Commissioner.  Reversed and Remanded.

Family Violence Appellate Project, Cory Hernandez, Shuray Ghorishi and Jennafer Dorfman Wagner; Horvitz & Levy, Jeremy B. Rosen, Melissa B. Whalen and Nicole P. Hood for Petitioner and Appellant.

No appearance for Respondent.

Complex Appellate Litigation Group and Mary-Christine Sungaila for Amicus Curiae California Women's Law Center in support of Petitioner and Appellant.

# INTRODUCTION

Appellant G.G. unsuccessfully sought renewal of a domestic violence restraining order (DVRO) against her former partner. The order was originally issued based on stalking. *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275 (*Ritchie*) establishes the legal standard a trial court must apply when determining whether to renew a restraining order. Courts renew a DVRO if the protected person has a reasonable apprehension of future abuse. To make this determination, courts analyze three factors set forth in *Ritchie*. Here, we reverse and remand for the trial court to reconsider its decision consistent with those factors, as articulated in *Ritchie* and its progeny.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     *Relationship Between the Parties*

Appellant and respondent were romantic partners and are the parents of two young children.[1] In her initial request for a DVRO, appellant testified that respondent repeatedly attempted to exert control over her during their relationship. If appellant did not do what respondent wanted, "he would intimidate and bully [her], get very angry, follow [her] through the house, corner [her]." Respondent planted a listening device in their home for the purpose of recording appellant. On multiple occasions, respondent took appellant's phone so that she could not call for help. He also physically pulled their daughter out of bed and tried to take her from their home.

Respondent was undeterred from this behavior by the presence or involvement of other people. Appellant is a court employee, and respondent

---

[1]     When the relationship ended, the older child was two years old and the younger child was eight months old. The younger child suffers from serious chronic health issues which require consistent care.

would follow her to work and watch her there, in her assigned courtroom. On multiple other occasions, the police were called because respondent "manhandl[ed]" appellant in public places.

In August 2019, respondent moved out of their shared home. After moving out, respondent planted another listening device. Thereafter, every time their daughter said the word "daddy" he would immediately call appellant. The relationship between appellant and respondent ended in January 2020.

## II.    *Original Restraining Order*

After the break-up, respondent repeatedly inquired if appellant was seeing someone else. Respondent sent appellant a picture that was taken from appellant's phone, to which he obtained access using appellant's Apple ID. Respondent also collected pictures of appellant from a dating site she used. Appellant heard someone walking outside her home and found her mail ransacked. In response to all this, appellant installed cameras at her house and asked respondent's family to intervene, which they attempted to do, unsuccessfully.

Appellant's new cameras recorded respondent's subsequent behavior. In April 2020, appellant captured footage of respondent hopping the fence, walking around the house, and looking in her window late at night. This happened at least twice.

For an entire week in May 2020, respondent drove back and forth (appellant described it as "cruising") in front of appellant's house every night. In June 2020, respondent "cruised" in front of appellant's house on 16 different nights and approached the house on foot twice, also at night. After that, respondent switched cars, but continued to regularly drive in front of

3

appellant's house for four more months. In total, appellant counted 70 incidents in which respondent appeared at or in front of her home at night.

Appellant filed a request for a DVRO on October 30, 2020. In support of her request, appellant filed a declaration that described how respondent had planted listening devices in her home, how he was monitoring her phone and her online presence, and how he had stalked her after the break-up.

The trial court issued a temporary restraining order and set a hearing. Respondent, who was self-represented, filed a response to appellant's request.

The hearing was held on December 14, 2020. Respondent again represented himself. Appellant testified and re-affirmed her written statement, adding that respondent had "intimidated" her during their relationship. She said all of respondent's appearances at her home, with one exception, had occurred in "the middle of the night," between 1:00 and 3:00 a.m. She presented the video recording showing respondent hopping a fence into her yard, then walking up to her window. She also presented the footage of respondent driving by her house, first in a white Dodge Challenger, then in a black sport utility vehicle of unspecified make and model. Finally, appellant discussed her decision to hire a private investigator in reaction to respondent's cruising.

Respondent asked one question on cross-examination, about information appellant claimed to have learned through the private investigator. Respondent briefly testified that he did not own or drive a black sport utility vehicle. But otherwise, respondent declined to dispute the evidence presented by the appellant.

The trial court found that respondent had been stalking appellant and issued a DVRO for a two-year period. The court also issued a child custody and visitation order to govern respondent's interactions with the children.

4

These orders permitted respondent to (1) communicate with appellant over the Talking Parents application, (2) visit the older child two Sundays per month, and (3) have a Facetime call with both children every Tuesday and Thursday at 8:00 p.m.  The orders also obliged respondent to provide appellant with a contact phone number and address where respondent could be reached during each visit with the older child.

### III.  *Request for Renewal*

In the period that followed these orders, appellant's unwanted contact with the respondent was reduced, but not wholly eliminated.  Appellant received several Facetime calls from respondent that were made outside the court-ordered visitation with the children.  Respondent tried to pass messages to appellant through a family member rather than using the authorized channel—the Talking Parents application.  Some of respondent's mail still came to appellant's house.  Appellant's uncle encountered respondent shopping at the grocery store appellant frequented.  Appellant took a video of what she believed was respondent's car driving up her street, though respondent could not be identified in the vehicle.  Finally, respondent used appellant's Apple account to purchase items for video games.

On December 1, 2022, two weeks before the expiration of the DVRO, appellant filed a request to renew, asking that the order be made permanent. In support, appellant filed a new declaration recounting the events that led to the issuance of the DVRO and giving a brief history of her interactions with respondent since.  This new declaration also added the information, not previously presented to the court, that the police had been called repeatedly during the parties' relationship "because of [respondent] manhandling [appellant] in public and within our home."

5

Respondent did not file a written opposition. The hearing on appellant's request was held on March 16, 2023. Both parties were represented by counsel.

At the hearing, appellant affirmed her declaration and provided additional details of what had happened since the order was issued. Appellant also clarified that the Facetime calls had occurred three to four times during the previous year. Appellant had not personally seen respondent at the grocery store. She did not get the license plate of respondent's car in her video but identified the vehicle as a silver BMW 5-series, which no one on her street owned. Appellant also produced a receipt which showed someone purchasing a three-month PlayStation subscription on her Apple account. Appellant testified that she was terrified about what would happen if the DVRO was not extended.

During his testimony, respondent denied making any purchases with appellant's Apple account. He suggested the charge might be an automatic renewal, which had been set up while the parties were together and never canceled afterward. Respondent admitted to sending one text message directly to appellant, in March 2022. However, he denied making the Facetime calls. He also denied any knowledge about his bills going to appellant's house. He explained that he was sometimes in appellant's regular grocery store because he works as a personal shopper through the Instacart platform, which requires him to go to grocery stores "all over Los Angeles" depending on where his clients are. He admitted to having a silver BMW 535i.

After argument, the trial court found no evidence that the Facetime calls were intentional. The court also found that respondent had no "pattern" of driving by appellant's home after the DVRO had been issued. The court

6

concluded that appellant's fear, while genuine, was not reasonable.  The request to renew the DVRO was denied.

Appellant timely appealed.

## DISCUSSION

I.      *Standard of Review*

"We generally review an order denying a request to renew a DVRO for abuse of discretion.  [Citation.]  But the question whether the trial court applied the correct legal standard in exercising its discretion is a question of law requiring de novo review.  [Citation.]  If the court's decision to deny a renewal request is influenced by an erroneous understanding of the law, the court has not properly exercised its discretion under the law."  (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 178–179 (*Michael M.*).)  We presume that the court applied the correct legal standard in the absence of evidence to the contrary.  (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 561 (*Cueto*).)

II.     *Governing Law*

Renewal of a DVRO is authorized by Family Code section 6345, subdivision (a), which permits a court to extend the term of an order "without a showing of further abuse since the issuance of the original order."  The renewal may be "for five or more years, or permanently, at the discretion of the court."  (Fam. Code, § 6345, subd. (a).)  The request should be made within the three months before the order expires.  (*Ibid*.)

The ability to renew a DVRO without a showing of further abuse is one part of a comprehensive statutory response to domestic violence, which the Legislature has identified as "the number one health risk among women." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 935 (1995-1996 Reg.

7

Sess.) as introduced Feb. 22, 1995, p. 4.) The scheme is "broad" in its intent, and each section must therefore be broadly construed to accomplish its purpose. (*N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 602.)

*Ritchie* is the controlling case on the renewal of a DVRO. That decision directs courts to renew the order if the protected person has a "reasonable apprehension" of future abuse. (*Ritchie, supra,* 115 Cal.App.5th at p. 1290.) Put another way, the question is whether a reasonable person, in the petitioner's circumstances, would fear repetition of the abuse if the order expired. (*Id.* at pp. 1288, 1290; see also *Cueto, supra,* 241 Cal.App.4th at pp. 560–561.)

*Ritchie* delineated three factors (the "*Ritchie* factors") to help courts answer that question. First, courts must consider the factual predicate for the original DVRO—the evidence and any findings on which it was based. (*Ritchie, supra,* 115 Cal.App.4th at p. 1290.) The mere existence of the order itself "seldom if ever" conclusively proves that it should be extended. (*Id.* at p. 1291.) However, the findings and facts which supported making the order "often will be enough in themselves" to justify renewing it later. (*Ibid.*)

Second, courts must consider any significant change in circumstances that occurred after the DVRO was issued. (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.) If the protected and restrained parties have "moved on with their lives," in a way that lessens the opportunity for or likelihood of future abuse, the need for the order may have dissipated. (*Ibid.*) On the other hand, if little has changed or there is now an increased possibility of abuse, the need for the order continues. (*Ibid.*)

While this factor clearly invites courts to consider how the restrained person has behaved since the DVRO was issued, courts must do more than simply ask whether the restrained person has violated the terms of the order.

8

An order that has never been violated may still be renewed. (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1284 ["section 6345 makes it unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect"].)

Third and finally, there is the issue of whether, and how much, the DVRO burdens the restrained party. (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1291.) This factor "may or may not" be relevant, depending on whether there is a risk of physical abuse. (*Ibid.*) On one hand, "the physical security of the protected party trumps all . . . burdens." (*Id.* at p. 1292.) On the other, if the danger presented is "a few unwanted calls or letters or e-mail messages," the court may weigh that danger against any burdens imposed by renewal. (*Ibid.*)

III.  *Trial Court's Order*

While making its ruling here, the court articulated the standard and factors adopted by *Ritchie*, frequently using its exact language. However, when the court specifically addressed the first *Ritchie* factor, it took the discussion no further than the observation that the original basis for the DVRO and respondent's alleged post-order behavior were both stalking. The court did not mention the severity of the behavior that occurred during the

9

relationship, when appellant testified that respondent had manhandled[2] her, cornered her, taken her phone, and followed her to work in a courthouse. Nor did the court address the various and repeated instances of threatening behavior that occurred after the relationship was over, when respondent placed a listening device in appellant's home and would persistently appear at the home uninvited.

When it considered the second factor, the court found no significant change in circumstances. And when it discussed the third factor, it found that the order placed no significant burden on respondent. None of the court's findings on the *Ritchie* factors suggest a basis to deny renewal, but it appears from the statements quoted below that the court did not rely on them.

The court framed its conclusion as follows:

"What it really comes down to is whether the apprehension by petitioner is reasonable as evidenced by ongoing fears and, as argued, the ongoing trauma and whether this court should issue the restraining order based on the fears.

"The fears appear to be real. The question is whether they are, in fact, reasonable and genuine. They clearly are genuine. The question is reasonableness.

---

[2] As noted above, the testimony of manhandling was presented at the renewal hearing, not at the original hearing. Therefore, it was not part of the basis for the original order. Nevertheless, the purpose of the first *Ritchie* factor is to review the history of abuse between the parties. (See *Michael M., supra,* 92 Cal.App.5th at p. 183.) Additional acts of past abuse remain relevant to reasonable fear of future abuse, no matter when they were committed or presented to the court. (See *In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 539; but see *In re Marriage of Martindale & Ochoa* (2018) 30 Cal.App.5th 54, 60 & fn. 2.)

10

"There, the court does find that there is insufficient evidence to find that the apprehension is reasonable. It appears that the instances— the instances cited by the petitioner may be cause for alarm but aren't necessarily reasonably grounded."

After commenting that the Facetime calls may have been accidental and that the silver BMW filmed by appellant may not have been respondent's,[3] the court repeated its finding that appellant's apprehension was not reasonable and announced that it would deny renewal.

At that point, appellant's counsel asked if the ruling was based on events that occurred after the original order was issued. After reiterating that it had considered the *Ritchie* factors, including the evidence that supported the original order, the court re-stated its reasoning:

"That is to say, if there was significant, say, physical harm that was alleged at the time of the issuance and the possibility of future physical harm, even if there wasn't future harm after the issuance of the restraining order, that still may be a basis for issuance based on the fact that the fear caused by the incidents themselves could be a basis for finding of reasonable apprehension.

"Here, the issue really does come down to there was at the time evidence of stalking and just causing—it appears to be intentional causing of fear by the—as your client has testified. . . .

"And that doesn't seem to be the evidence that since the issuance there's any such conduct. In other words, it seems to me, based on the evidence presented, that most of the instances just happened to—they certainly have been the reason to be apprehensive based on her

---

[3]    Appellant does not challenge these factual findings on appeal.

11

experience, but are not now—they don't strike this court as being a reasonable basis to continue the restraining order."

III. *Application of Ritchie Factors*

Appellant argues that the court did not apply the correct legal standard. More specifically, she asserts that the court made two related legal errors: (1) in suggesting that a DVRO can be renewed based on the original facts only if those facts included significant physical abuse, and (2) in concluding that the lack of subsequent intentional violations of the DVRO was sufficient to decide the issue. Appellant is correct on both counts.

The court concluded that the case "really comes down to" whether the renewal is justified by "ongoing" events. The court also said that its position might change if the initial order was based on "significant physical abuse." These statements indicate a framework where (a) the original facts and evidence could only justify renewal of the order if they involved physical abuse, and (b) where they did not, renewal would only be appropriate if the abuse was ongoing. This is not the legal framework constructed by *Ritchie* and its progeny.

A. *Types of Abuse*

The definition of "abuse" contained in Family Code sections 6203 and 6320 is the "linchpin" of the Legislature's efforts to prevent domestic violence. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1141 (2019-2020 Reg. Sess.) as amended May 6, 2020, p. 1.) The Legislature added stalking to its definition of "abuse" in 1995, in the same session that amended Family Code section 6345, subdivision (a) to allow renewal of DVROs "without a showing of further abuse." (Stats. 1995, ch. 598, § 1, p. 4562; Stats. 1995, ch. 907, § 2,

p. 6907; Judicial Council of Cal., Ann. Rep. (1996) p. 196 [summary of 1995 court legislation].)[4]  Family Code section 6320, subdivision (c) currently defines "abuse" to include "coercive control," a "pattern of behavior" characterized by, among other things, "monitoring the other party's movements [and] communications."[5]

The law does not permit courts to make a distinction between physical and non-physical abuse when issuing DVROs.  Nor is there any indication that courts should make such a distinction when deciding whether to renew them.  And with good reason.  Stalking is "strongly associated with physical violence"; men who stalk their partners after a break-up are four times more likely to assault them.  (Lo, *A Domestic Violence Dystopia: Abuse via the Internet of Things and Remedies under Current Law* (2021) 109 Cal. L.Rev. 277, 282.)  But stalking and other controlling behaviors are more than just useful predictors of future physical harm.  They cause significant psychological damage on their own:

> "Most serious crimes such as rape, robbery, and assault, are isolated events in the lives of victims, and the experiences, however horrible, have a beginning, middle, and end. . . .  [W]hat distinguishes stalking is the added layer of ambiguity, uncertainty, and nonfinality of the ordeal. . . .  Even when the identity of the stalker is known or strongly suspected, the victim often finds that there is very little she can to do to [*sic*] stem the multiple streams of abuse knocking at her door, haunting

---

[4]     The two measures originally overlapped; they were coordinated in committee.  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 935 (1995-1996 Reg. Sess.) as introduced Feb. 22, 1995, p. 4.)

[5]     This codified an understanding already extant in case law.  (See *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1452.)

her phone, or poisoning her email. Thus, the psychological toll of living with a stalking scenario can be a constantly traumatizing nightmare that may persist for months or years." (Miller, *Stalking: Patterns, motives, and intervention strategies*, 17 Aggression and Violent Behavior (2012) pp. 501–502.)

The impact can be even worse where electronic surveillance is involved because that allows the abuser to create a "sense of omnipresence," eliminating the victim's ability to feel safe in any environment. (Lo, *supra*, at p. 285.)

In keeping with the Legislature's determination to prevent all types of abuse, *Ritchie* makes no distinction between physical and non-physical abuse in the application of its first factor. Subsequent case law likewise rejects that distinction. (See *Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 875 (*Rybolt*); *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 397 (*Perez*) ["[t]he key consideration for the court is not the type or timing of abuse"].) The first factor simply requires the court to consider whether the facts which supported issuing the DVRO in the first place still support the order at the time of the renewal request. (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.) The original order could be issued based on reasonable fear of non-physical abuse, and it can be renewed on the same basis. (*Id.* at p. 1288.)

*Ritchie* does discuss the wide variety of behaviors that might lead a court to issue a DVRO, as support for its holding that renewal should not be *automatic*. (*Ritchie, supra*, 115 Cal.App.4th at pp. 1290–1291.) But the goal of that discussion is to illustrate differing degrees of danger, not make a legal distinction based on the kind of danger. (*Id.* at p. 1290 [comparing a half-dozen violent incidents accompanied by a psychological evaluation with "a single threat issued in an angry moment during a painful divorce"].) A

14

brightline physical/non-physical distinction does not appear in the analysis until the *third* factor.  (*Id.* at pp. 1291–1292.)  Even then, the distinction operates as a potential limitation on the evidence offered in *opposition* to renewal; it does not affect the showing required to obtain renewal.  (*Ibid.*)

### B.    *Ongoing Abuse*

Renewal of a DVRO is not conditioned on the presence or absence of "ongoing" events.  The renewal statute, quoted above, provides that orders may be renewed "without a showing of further abuse since the issuance of the original order." (Fam. Code, § 6345, subd. (a).)  *Ritchie* observes that a person asking for renewal of a court order should not be required to prove that the order has been (at least partially) ineffective.  (*Ritchie, supra*, 115 Cal.App.4th at p. 1284.)  Later cases have consistently agreed.  (See *Michael M.*, *supra*, 92 Cal.App.5th at p. 180; *Rybolt, supra,* 20 Cal.App.5th at pp. 875–876; *Cueto, supra*, 241 Cal.App.4th at p. 561; *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1464.)

Restraining orders are generally obeyed; people who obtain restraining orders are far less likely to report future abuse.  (Stoever, *Enjoining Abuse: The Case for Indefinite Domestic Violence Protection Orders*, 67 Vand. L. Rev. 1015, 1064–1066; see also Miller, *supra*, at p. 502.)  However, obedience to an order may well end when the order does.  Stalkers tend to be much more persistent when they have a previous relationship with the victim.  (McEwan, et al., *A Study of the Predictors of Persistence in Stalking Situations*, 33 Law & Hum. Behav. 149.)  They are also "quick learners when it comes to observing the letter of the law while circumventing its spirit."  (Miller, *supra*, at p. 503.)  Therefore, the more comprehensive an order can be, and the

15

longer it remains in place, the better the odds that the abuse will end. (Stoever, *supra*, at p. 1066.)

*Ritchie* asks courts to adopt a practical view of their own orders. A court order may change behavior, but that does not mean it has solved the problem. The underlying issue may remain, even if the order has been followed. The first *Ritchie* factor asks the court to reacquaint itself with the nature of the problem, reminding the court that the original evidence will "often" be enough by itself to justify a renewal. (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.) The second *Ritchie* factor asks the court to check for any external reasons to believe that the situation has changed and the order is no longer necessary. (*Ibid.*) The third *Ritchie* factor gives the restrained party the chance, assuming that chance has not been forfeited, to ask the court to ameliorate any burdens the order may place on them. (*Id.* at pp. 1291–1292.)

C.    *This Case*

If a reasonable person in appellant's situation would have a reasonable apprehension that the abuse would resume after the order's expiration, the order should be renewed. (See *Cueto, supra*, 241 Cal.App.4th at pp. 559–560; see also *Lister v. Bowen* (2013) 215 Cal.App.4th 319, 332–333.) The trial court's decision here was predicated on the absence of intentional violations of the initial order. Use of such a narrow focus prevented the court from exercising its discretion. (See *Perez, supra,* 1 Cal.App.5th at p. 398; *Eneaji, supra*, 229 Cal.App.4th at pp. 1464–1465.)

As set forth above, the evidence shows that appellant has children with respondent. While they were in a romantic relationship, respondent physically intimidated appellant, manhandled her in public, seized their

16

children, and stalked appellant at a courthouse. Respondent planted listening devices in appellant's home both while he lived there and after he moved out. After the relationship ended, respondent stalked appellant at least 70 times in the small hours of the night, called and sent messages outside of authorized channels, and retained some level of access to appellant's Apple account. The trial court must apply the *Ritchie* framework to determine whether a reasonable person, having experienced the abuse described above, would have a reasonable apprehension that the abusive behavior would resume after the order's expiration.

Because we conclude that the court did not exercise its discretion by applying the legal standards articulated in *Ritchie* and its progeny, we do not consider appellant's argument that the court abused that discretion.

## DISPOSITION

The order denying the request to renew the DVRO is reversed. The matter is remanded. The trial court is directed to hold a new hearing and reconsider the request for renewal consistent with the legal framework outlined above. Appellant is awarded her costs on appeal.

**CERTIFIED FOR PUBLICATION**

ZUKIN, J.

WE CONCUR:

CURREY, P. J.                    COLLINS, J.

17