Filed 5/9/24; Certified for Publication 6/5/24 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CHARNAE BAILEY, | |
| Plaintiff and Respondent, | E081558 |
| v. | (Super.Ct.No. FAMSB2301122) |
| JASON MURRAY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Shannon N. Suber, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Frank Bazadier for Defendant and Appellant.

No appearance by Plaintiff and Respondent.

A woman sought a domestic violence restraining order (DVRO) against a former intimate partner, alleging he sexually assaulted her after the relationship had ended. The trial court granted a temporary restraining order (TRO) which, among other things, barred the partner from possessing firearms and from going to the church they attended.

At a later DVRO hearing, the trial court issued a DVRO, finding the man had sexually assaulted the petitioner and had committed subsequent acts of abuse by attending the same church as the petitioner and possessing a firearm, both in violation of the TRO. He appeals on the ground that the trial court violated his procedural due process rights by conducting a direct examination of petitioner, allowing her to testify about an incident of sexual assault not contained in the petition, admonishing his counsel about his method of questioning his client, and by depriving him of the opportunity to respond to a law enforcement firearms report that showed he owned a firearm. Because we conclude the procedures in the trial court were adequate, we affirm the protective order.

# I

# FACTS

A. *The Petition and the TRO*

On April 3, 2023, respondent Charnae Bailey filed a request for a DVRO against appellant Jason Murray, a former intimate partner, under the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq., unlabeled statutory citations refer to this code). The trial court entered a TRO the same day and set a hearing on whether to enter a DVRO. Murray was personally served with the TRO on April 7, 2023.

2

The record on appeal does not contain copies of Bailey's petition or the TRO. Our summary of both comes from the transcript of the hearing for a DVRO. According to the trial court, the TRO barred Murray from contact with Bailey and barred him from attending the church where the two met and where they attended services.

The TRO also barred Murray from possessing firearms. On April 24, Murray said he had no guns or ammunition. Bailey said she believed he did possess weapons.

B. *Evidence of Abusive Conduct*

Bailey was not represented by counsel. Rather than have her question herself while testifying, the trial court asked her questions, and Bailey responded. Murray's counsel asked whether the court was "going to be conducting the petitioner's direct examination for her?" The trial court responded, "I was just asking her open-ended questions about what caused her to file. . . . But she is essentially engaging in her own direct. I don't think it's productive to ask questions of oneself and give an answer, which is generally how direct works." The court assured Murray's counsel that he would "be able to cross-examine her just as if an attorney did her direct examination" and make objections at any time.

Bailey and Murray both testified that they had a consensual sexual relationship starting sometime after they met at their church. Murray said they met in late 2016 or 2017 and their sexual relationship lasted from late 2017 to August 2022. Bailey said their relationship started in 2019 and ended in January 2021.

3

According to Bailey, Murray sexually assaulted her on a Sunday in early January 2021, and this incident led her to end their relationship. Bailey was preparing to go to church when she received a call from Murray asking for a ride because he had car problems. She told him she was in a hurry to get to a church event but agreed to pick him up. When she arrived, they agreed he would drive because he would get them there faster. However, instead of driving to church, he drove her to a furnished but unoccupied house he owned. She said he took her to the bedroom, "pinned me down on the bed. And then we just like had intercourse. He just did it to me." She said she told him she did not want to engage in sexual relations, resisted his advances verbally and physically, and he ripped her clothes when they were struggling. Afterward he disclosed he had made a video without her knowledge or consent.

Bailey said that incident led her to break off the relationship and start avoiding him. He continued to try to contact her. Eventually, she quit her job, moved to a different city, and stopped going to church for a while. She said she kept telling him, "This relationship isn't for us. I don't want to be in a relationship with you. [¶] And he just kept saying, 'No. I told you from the beginning, like, you're mine.' You know, he just kept acting like I was a piece of property to him."

Murray's counsel asked Bailey whether she had included the January 2021 incident on her petition. Bailey said she told the person who helped her fill out the petition about the incident and thought the petition included the facts. However, after being shown the petition in court, she conceded the assault was not described there.

4

The incident identified in Bailey's petition occurred on Super Bowl Sunday, February 12, 2023. At the hearing, Bailey said Murray came up to her in the parking lot of their church. He tried to convince her to go with him so they could talk. She resisted but said Murray blocked her car until she relented. Murray then drove Bailey to his house. Bailey said she expected to stand there and talk, but when she opened the door "he grabbed me out of the car, picked me up and carried me into his house and tried to sexually assault me." She attempted to fight him off, but he persisted, saying, "If this is the last time, then let's just have intercourse one more time." Bailey said Murray pulled her clothes off, took his own clothes off, and pulled her into his bedroom. She said Murray professed his love for her, reassured her that he was not going to "do anything to [her]," but kept her there for 15 to 20 minutes before he let her leave. Murray called her after the incident, but they spoke only once and she told him "I don't want to talk to you anymore."

C. *Murray's Testimony*

Murray testified that his consensual sexual relationship with Bailey continued all the way through August 2022. He denied sexually assaulting Bailey on February 12, 2023. Instead, he said Bailey drove to his house that day and entered his home on her own. He said she took off her clothes while in his living room, but he rejected her advances and asked her to leave. He said she was gone after six or seven minutes. A long-time neighbor testified that he was sitting in his car next door that day and saw

5

Bailey arrive by herself, go into Murray's home on her own, and leave about ten minutes later.

Murray admitted trying to call Bailey several times after that incident, but he claimed he was trying to get her to turn over the warranty paperwork for a car he had bought from her.

D. *Gun Possession*

At the end of the first day of the DRVO hearing, the court notified Murray that it had received a standard report on his criminal history that said a Smith and Wesson 9-millimeter handgun is registered in his name. The court said Murray had not disclosed owning the gun nor filed a required form (DV-800) indicating it had been turned over. The court provided Murray with a copy of the DV-800 form, said he would have until the next day to file it, and warned failure to do so would result in the court finding him in violation of the TRO.

The next day, the trial court informed Murray it had received his DV-800 but told him it appeared to be incomplete. Murray reported he was not in possession of the gun and had turned it over to a particular licensed gun dealer in Torrance. The form did not disclose the date and time Murray had turned the gun over to the dealer, and the court noted the gun was still registered in Murray's name. Murray's counsel said in his rush to file the form he had misunderstood the field asking for the name of the gun dealer and "just put that location as a licensed gun dealer that I'm familiar with."

6

Murray declined to say more about the whereabouts of the gun. His counsel said, "[M]y client is not in possession of this firearm[.] . . . He's not in possession of it. And so I'll just short circuit this conversation politely as I can. It's our position, again, he's not in possession. So if the Court feels as though they have to report it to the next party, the District Attorney's office to potentially file on this matter, then that's fine."

The trial court informed Murray that he was currently out of compliance with the TRO and encouraged him to fill out the DV-800 during a break. "But I'm going to need more than you just wrote down some place in Torrance that you're familiar with as a licensed gun dealer because that's not where he turned it over. . . . [S]o essentially what he's told me is it's not in my possession and I'm not going to tell you where it is." Counsel responded, "it's my position that assuming my client wants to exercise his Fifth Amendment [rights] and not be compelled by this Court to disclose beyond it's not in my possession, and if the Court feels mandated to report to the District Attorney, what I'm saying [is] that's fine."

Murray did not provide an updated DV-800 or provide the court with any other information about his gun ownership until the court had ruled. At that point, against advice of counsel, Murray said, "I have never owned a Smith & Wesson pistol."

E. *The DVRO Ruling*

The trial court granted Bailey's request for a DVRO after finding incidents of abuse. The court noted the conflict in the parties' testimony about what happened on February 12, 2023, that Murray never specifically denied sexually assaulting Bailey, or

7

attempting to do so, but testified when they had sex it was consensual. The court also noted the neighbor's testimony corroborated Murray's story only in part, and noted he was an interested party as a long time neighbor. The court pointed out Bailey's testimony that Murray attended their church twice since the TRO was issued and that Murray did not deny that was true. Finally, the court noted that Murray had declined to present evidence that he did not possess the gun that was registered to him, and in fact declined at the hearing to deny possessing the gun. Both these last acts were themselves violations of the TRO and grounds to grant the DVRO.

The court concluded, "Based on the status of all of that evidence, I find Petitioner has met her burden and will grant a restraining order for a period of three years. The court noted, citing *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, that by going to the church and maintaining possession of a firearm, both acts that violated the TRO, Murray had committed acts of abuse warranting a DVRO.

## II

## ANALYSIS

Murray argues the trial denied him procedural due process when it conducted the DVRO hearing and requests remand for a new hearing before a new magistrate.

The DVPA defines domestic violence to include abuse of a person with whom the respondent is having or has had a dating relationship. (§ 6211, subds. (c).) The Legislature defined "abuse" broadly to include intentionally or recklessly causing or attempting to cause bodily injury, sexual assault, placing a person in reasonable

8

apprehension of imminent serious bodily injury, or engaging in behavior that could be enjoined under section 6320. (§ 6203, subd. (a).)

A trial court may enter an ex parte order enjoining a variety of acts, including "molesting, attacking, striking, stalking, threatening, sexually assaulting, [or] battering." (§ 6320, subd. (a).) The Legislature also specified it would be an incident of abuse to "engage in any behavior that has been . . . enjoined" by such a temporary restraining order. (§ 6203, subd. (a)(4).)

In general, we defer to the trial judge when reviewing an order granting or denying a DVRO. We review such decisions for abuse of discretion. (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.) We review a trial court's factual findings for substantial evidence. (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) "The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law requiring de novo review." (*In re Marriage of F.M. & M.M.*(2021) 65 Cal.App.5th 106, 116 [cleaned up].)

In this case, Murray does not argue the court's findings were not supported by substantial evidence, that the court abused its discretion in determining a DVRO was warranted, or even that the trial court applied the wrong legal standard. Instead, he argues the trial court denied him procedural due process in several ways. "We review procedural due process claims de novo because 'the ultimate determination of procedural fairness amounts to a question of law.' " (*In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241.)

9

Murray argues first that questioning Bailey may have compromised the trial court's role as a neutral arbiter. A trial court could compromise its role if it assumed the advocacy role of one side's attorney in questioning a witness. On this record, though, we see no problem with the way the court proceeded.

In general, "[a] trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony" and so long as the court does not "assume the role of either the prosecution or of the defense. [Citation.] The court's questioning must be ' "temperate, nonargumentative, and scrupulously fair" ' [citation], and it must not convey to the jury the court's opinion of the witness's credibility." (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

Bailey was unrepresented in the trial court, while Murray was represented by counsel. Bailey was the first witness at the hearing. Rather than have Bailey go through the pretense of posing questions to herself and then answering them, the trial court asked Bailey general questions that allowed her to tell the trial court the basis for her request for a DVRO. Murray questioned the procedure at the hearing, and the trial court explained its rationale for asking questions and reassured Murray he would be able to object and to cross-examine Bailey.

Our review of the questioning convinces us the trial court did not compromise its neutrality. As the court indicated it would do, it asked general, open-ended questions, such as the following: "You stated that an incident occurred on March 27th, 2023, that

caused you to file for a domestic violence restraining order. Can you tell the Court specifically what happened during that incident that caused you to file for a restraining order?" "And so what happened on [Super Bowl Sunday, February 2023] that caused you to file the request?" "Anything else you want to tell the Court about why you are requesting a restraining order?" These questions elicited Bailey's testimony about the two incidents of sexual abuse. They were not questions that were in some way advocacy for a side. The trial court's remaining questions sought details and clarifications from Bailey and were equally unobjectionable. We conclude the trial court acted appropriately in conducting this questioning, restricting itself to eliciting material facts with general questions and clarifying confusing and incomplete testimony.

Murray also objects the trial court deprived him of due process by "admonishing this counsel how to examine his own client." The objection seems to be to the trial court's suggestion that counsel avoid leading questions while examining Murray. "[S]o a lot of the questions that you ask are very leading because they suggest a response. When people testify it's helpful to know what they actually saw or witnessed, so he hasn't testified as to Ms. Bailey's demeanor or affect at any point. He's just answered 'no' to your questions about it. . . . [¶] It was okay when you were asking the adverse witness leading questions. That's fine, of course, but I'm not really getting very much information from your client . . . when you ask him leading questions. The more open-ended answers that he's provided as he's about to do are more helpful so the Court can get more information from his perspective about what he saw, heard, and so forth."

11

This was sound advice, not a violation of due process. In the first place, the trial court did not strike counsel's questions or the answers they elicited. Rather, the court allowed the answers to stand but provided Murray's counsel guidance on how to elicit testimony that might be more useful to a fact finder. Thus, the comments did not limit Murray's ability to present evidence, and, if anything, assisted him in presenting his case. Since the trial court was the fact finder, there was no danger that the court's comments would influence jurors. The trial court did not err in providing this advice. Even if the court had erred, we would find it harmless because the court allowed the testimony.

Murray next objects that the trial court allowed Bailey to testify about incidents of abuse she did not allege in her petition. Murray objected on this basis to Bailey's testimony about the alleged sexual assault in January 2021. Bailey conceded the incident did not appear in her petition, though she said she told the person who helped her fill out the petition about it. The trial court allowed the testimony on the ground that the law required the admission of evidence concerning all incidents of abuse in the same category as the abuse alleged in the petition.

We agree with the trial court's decision. The DVPA "does not impose on a victim of domestic abuse a pleading obligation that he or she describe all individual actions taken by the alleged abuser in the DVRO request in order later to testify about those acts at the hearing, as long as the alleged abuser is placed on notice of the general allegations." (*In re Marriage of Davila and Mejia*, *supra*, 29 Cal.App.5th at p. 222.) Bailey's allegations of sexual assault provided notice giving Murray a "meaningful

12

opportunity to respond to the specific allegations at the hearing, and to request a continuance if he need[s] additional time to respond." (*Id*. at 239.) If Murray was not prepared to respond to Bailey's specific allegations concerning the January 2021, then he could have requested a continuance. (§ 245, subd. (b) [hearing on request for DVRO may be continued for good cause upon request by either party].) Murray did not request a continuance, but instead testified their sexual activity was consensual.

The admission of evidence concerning abuse that occurred after she filed her petition "is also relevant, particularly when that abuse occurs after a temporary restraining order has been issued." (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 117.) This is so because "[t]he purpose of a domestic violence restraining order is not to punish past conduct, but to 'prevent acts of domestic violence [and] abuse' from occurring in the future." (*Ibid.*) The trial court was required to consider the evidence that Murray had violated the TRO by continuing to attend church with Bailey and by continuing to possess a firearm. (*N.T. v. H.T.*, *supra*, 34 Cal.App.5th at p. 602.) "Section 6203, subdivision (a)(4) specifically provides that engaging in behavior that has been enjoined pursuant to section 6320 constitutes abuse for purposes of the DVPA." (*Ibid.*) Murray was ordered to turn over any firearms in his possession and cease attending services at the church. The trial court found he failed to turn over a firearm but continued to attend the church, both violations of the TRO and therefore additional acts of abuse under the express terms of the statute.

Finally, Murray argues the trial court deprived him of the opportunity to contest whether he continued to possess a firearm in violation of the TRO. Specifically, Murray argues he "never had an opportunity to contest the [trial court's] independent CONCLUSION that Appellant was in fact the registered gun owner per THE CLETS REPORT WHICH THE COURT NEVER DISCLOSED TO ANYONE." This characterization misrepresents what happened in the trial court.

The court was solicitous of Murray's rights during the DVRO proceedings. After the court issued the TRO, it inquired of Murray whether he owned or possessed a firearm. He represented he did not have a gun at his first court appearance, but Bailey said she believed he did. At a later hearing, the trial court notified Murray a standard criminal history report showed he was the registered owner of a Smith and Wesson 9-millimeter handgun. The trial court informed him that continued possession of the firearm would be a violation of the TRO and require the court to report him. The court provided Murray with form DV-800, which would enable him to establish he had transferred the weapon to another registered user.

Murray's counsel filled out and submitted the form, but it came out the next day the submission was inaccurate, and Murray had not transferred the gun to a registered dealer. The trial court admonished him that failure to submit a revised form could result in legal consequences, including a finding that he had violated the TRO. However, Murray, through counsel, made the choice to invoke his Fifth Amendment right against self-incrimination and not answer questions about the gun other than to state that he was

14

no longer in possession of it. Based on the law enforcement report, the trial court found Murray was in possession of a firearm and found he had violated the TRO.

We conclude Murray's position on appeal is simply counterfactual. The trial court gave Murray several opportunities to respond to the report that he was the registered owner of a firearm, and he refused to respond fully. There was no procedural due process error. And while Murray claimed after the trial court had ruled that he had never possessed the firearm and questioned the veracity of the report, the court did not change its ruling. Since Murray does not challenge the sufficiency of the evidence for the court's finding, we do not address that question.

## III

## DISPOSITION

We affirm the order granting a domestic violence protective order. Bailey is entitled to recover any costs she incurred on appeal.

RAPHAEL
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

15

CERTIFIED FOR PUBLICATION
COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO


| | |
|---|---|
| CHARNAE BAILEY, | E081558 |
|     Plaintiff and Respondent, | |
|     v. | (Super.Ct.No. FAMSB2301122) |
| JASON MURRAY, | |
|     Defendant and Appellant. | ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

_____


THE COURT

The request for publication filed on May 29, 2024 is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 81105(c).  IT IS ORDERED that the opinion filed in this matter on May 9, 2024 be certified for publication.

CERTIFIED FOR PUBLICATION


RAPHAEL_____
                                                                                                    J.


We concur:


McKINSTER_____
        Acting P. J.


MILLER_____
        J.